Duane H. Mathiowetz (CA# 111831)
PRACTUS, LLP
201 Spear Street, Suite 1100
San Francisco, CA 94105
Phone: 415-501-0350
Email: duane.mathiowetz@practus.com

B. Scott Eidson (Pro Hac Vice)
Julie C. Scheipeter (Pro Hac Vice)
John R. Schroeder (Pro Hac Vice)
Judith Araujo (Pro Hac Vice)
STINSON LLP
7700 Forsyth Blvd., Suite 1100
St. Louis, MO 63105
Phone:  314-863-0800
Email:  scott.eidson@stinson.com
Email:  julie.scheipeter@stinson.com
Email:  john.schroeder@stinson.com
Email:  judith.araujo@stinson.com

Attorneys for Defendant
MITEK INC.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| SIMPSON STRONG-TIE COMPANY INC.,<br><br>Plaintiff,<br><br>v.<br><br>MITEK INC.,<br><br>Defendant. | Case No. 5:20-cv-06957-VKD<br><br>**MITEK INC.'S REPLY IN SUPPORT OF ITS MOTION TO EXCLUDE PLAINTIFF'S SURVEY EXPERT, ROBERT WALLAECE**<br><br>Date: November 8, 2022<br>Time: 10:00 a.m.<br>Crtm: 2<br>Judge: Honorable Virginia K. DeMarchi |

- 1 -

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Simpson's opposition cannot avoid highlighting the pervasive flaws in the surveys conducted by its survey expert, Mr. Wallace. As set forth in MiTek's motion and further herein, Mr. Wallace's surveys do not contain mere "technical inadequacies" and instead were not conducted in accordance with accepted survey principles, which require their exclusion. Faced with the issue of improperly biased questioning, Simpson can do little more than repeat the questions and responses provided. Simpson also cannot explain how Mr. Wallace's survey participants, which included certain construction professionals lacking knowledge about the structural connector industry and excluded anyone other than certain construction professionals, provide a proper universe for Mr. Wallace's surveys. This series of errors is compounded at the control stage, where, here too, Simpson cannot justify Mr. Wallace's inadequate controls reflected in the absurd survey results. Mr. Wallace should not be permitted to offer opinions based on his wholly unprincipled surveys, and the Court should grant MiTek's motion to exclude Mr. Wallace from testifying as an expert witness in this case.

## II. ARGUMENT

### A. Mr. Wallace's opinions should be excluded because his surveys were not conducted in accordance with accepted principles.

Simpson attempts to characterize the issues with Mr. Wallace's survey as critiques of "technical inadequacies." However, this misses the mark. MiTek's argument for exclusion is that the totality of flaws in Mr. Wallace's surveys make them unprincipled—which requires exclusion of the surveys and related opinions. Though critiques of inadequate methodology may go to a survey's weight, the Ninth Circuit recognizes that surveys not conducted according to accepted principles should be excluded. *See M2 Software, Inc. v. Macacy Entm't*, 421 F.3d 1073, 1087 (9th Cir. 2005) (excluding survey where it "was [not] conducted in accordance with generally accepted survey principles and . . . the results were [not] used in a statistically correct manner.").

"'[P]rinciples' refers to the theories an expert employs to explain certain observed facts." 9C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 6268.1 (2d ed.).

Here, Mr. Wallace asserts that he conducted his surveys in accordance with the following principles set forth in the *Manual for Complex Litigation*:

> a) The proper universe(s) should be properly chosen and defined;
>
> b) The sample of respondents chosen from the proper universe should be representative of that population;
>
> c) The questions asked should be clear and not leading;
>
> d) The data gathered should be accurately reported;
>
> e) The data should be analyzed in accordance with accepted statistical principles;
>
> f) The surveys should be conducted by qualified persons following proper interview procedures;
>
> g) The surveys should be conducted in anticipation of litigation and by persons not connected with the parties or counsel or by persons aware of its purpose in the litigation.

Dkt. No. 68-1 at ¶ 15; *see also* Dkt. No. 94 at 4:15-17. However, Mr. Wallace merely gave lip service to these principles. Specifically, as set forth in MiTek's motion and further below, Mr. Wallace fundamentally failed to comply with at least the first five principles: (a) choosing a proper universe; (b) using a sample of respondents that is representative of the proper universe; (c) using questions that are clear and not leading; (d) reporting the data gathered accurately; or (e) analyzing the data in accordance with accepted statistical principles.[1]

Simpson's citations to case law admitting flawed surveys is unpersuasive, as the surveys in those cases are distinguishable and the admission of expert testimony is a fact-specific inquiry left to the district court's discretion. *See, e.g.*, *Ramirez v. Olympic Health Mgmt. Sys., Inc.*, 610

---

[1] Because these five principles overlap with methodological concerns, the law of other circuits holding that surveys should be excluded where the methodology is so severely flawed may be instructive. *See, e.g.*, *Superior Consulting Servs., Inc. v. Shaklee Corp.*, No. 19-10771, 2021 WL 4438518, at *12 (11th Cir. Sept. 28, 2021); *Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110, 121 (3d Cir. 2004); *Malletier v. Dooney & Bourke, Inc.*, 525 F.Supp.2d 558, 569-70 (S.D.N.Y. 2007).

F.Supp.2d 1266, 1276 (E.D. Wash. 2009) (citing *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 150 (1999)) ("Rule 702 permits a flexible, fact-specific inquiry that embodies the twin concerns of reliability and helpfulness."). As such, in those cases it was well-within the courts' discretion to find that the issues in the survey instruments did not indicate that they were unprincipled or would otherwise warrant exclusion. Likewise, the excerpt from *Trademark and Deceptive Advertising Surveys* providing that a survey with "some flaws" may still be "partially probative" misses the mark, as that excerpt contemplates technical inadequacies going to a survey's weight and only briefly addresses instances where a survey is not conducted in accordance with accepted principles, by stating that the expert must attempt to "comply with the accepted guidelines listed in the *Manual for Complex Litigation*." *See* Dkt. No. 95-1 at 228-29. Such compliance did not occur here.[2]

### B. Mr. Wallace's opinions are built on a series of unprincipled survey choices.

At the outset, MiTek's motion to exclude is not "about how Mr. Wallace's surveys could have been improved," *see* Dkt. No. 94 at 12:12, it is about exposing that Mr. Wallace did not conduct his surveys in accordance with accepted principles.[3] Moreover, Simpson fails to address key shortcomings in the surveys and opinions that warrant their exclusion.

#### 1. Mr. Wallace failed to ask clear and non-leading questions.

With respect to the survey principle under the *Manual for Complex Litigation* that "the questions asked should be clear and not leading," Dkt. No. 68-1 at ¶ 15(c), MiTek's critique that Mr. Wallace's false advertising surveys were not conducted in accordance with accepted questioning approaches, such as *Eveready* and *Squirt*, is well-founded. To begin, Mr. Wallace

---

[2] MiTek acknowledges that a bench trial diminishes the concerns of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence" under Rule 403. However, these concerns, though more limited, may still be employed in determining the admissibility of evidence and whether any probative value the evidence may have is substantially outweighed. *See Fox v. De Long*, No. 2:14-cv-02947-KJM, 2016 WL 6088371, at *12 (E.D. Cal. Jan. 8, 2016).

[3] To the extent Simpson argues that the opinions of MiTek's expert, Professor David Franklyn, are inadmissible or should be given less weight, MiTek's opposition to Simpson's motion to exclude Professor Franklyn addresses Simpson's arguments and supports the admissibility of Professor Franklyn's rebuttal opinions on Mr. Wallace's surveys and report. *See* Dkt. No. 102.

contends that the advertising portion of his survey was an *Eveready*-type survey. Dkt. No. 86 at 174:15-23. Simpson further concedes that "it was reasonable and appropriate to take aspects of an Eveready survey and modify them for this false advertising case," Dkt. No. 94 at 13:8-9, which makes sense as Mr. Wallace's surveys test confusion by false advertisement that is closely related to, if not repackaged, confusion by false association. *See, e.g.*, Dkt. No. 68-1 at ¶ 2; *see also* Dkt. No. 99-3 § III.B.1. However, Mr. Wallace failed to meet the accepted principles of an *Eveready* or *Squirt* survey by relying on the use of improperly leading and suggestive questions throughout the surveys. *See, e.g.*, *Simon Prop. Grp. L.P. v. mySimon, Inc.*, 104 F.Supp.2d 1033, 1041 (S.D. Ind. 2000) (explaining that an *Eveready* survey requires the use of non-leading questions).

MiTek's various criticisms of Mr. Wallace's questions highlight the ways in which the questions are improperly suggestive and leading. *See* Dkt. No. 76 at 7:1-11:9. For example, the following has been held a proper series of questions after participants viewed a dryer commercial as a stimulus:

> The questionnaire . . . asked three open-ended questions at the beginning of the survey:
>
> > 1. "What was the main idea of the commercial?"
> >
> > 2. "What else, if anything, did the commercial say, show or imply?"
> >
> > 3. "Did the commercial say, show, or imply anything about any unique feature of the advertised dryer?"
>
> . . . [T]o respondents answering [the third question] in the affirmative, [the questionnaire] asked two follow-up, or "probe" questions: (3b.) "what did the commercial say, show, or imply about any unique feature of the advertised dryer?"; and (3c.) "Anything else?" (Id.) The interviewer then provided the respondents with a card that contained descriptions of two dryers, "Dryer A" and "Dryer B," as follows:
>
> > DRYER A
> >
> > A mist of cold water is injected into the heated dryer drum. The dryer then heats the water and tumbles the clothes until dry.
> >
> > DRYER B
> >
> > A hot vapor is injected onto clothes inside the dryer drum. The dryer then heats and tumbles the clothes until dry.

With these descriptions in hand, Respondents then answered the following closed-ended question:

> 5. Thinking of the commercial you just saw and what it said, showed, or implied about the advertised dryer, do you think the commercial ...
>
> Could be for Dryer A only
>
> Could be for Dryer B only
>
> Could be for either Dryer A or Dryer B
>
> Could not be for either Dryer A or Dryer B or, don't you know?

*LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, 661 F. Supp. 2d 940, 953-54 (N.D. Ill. 2009). Here, in contrast, in the first substantive question participants were presented, Mr. Wallace asked participants, after showing a MiTek product label, "Based on this product label, do you believe that MiTek's ADTT-TZ product is equivalent to the DTT1Z product?" "Yes," "No," or "Don't know." Dkt. No. 68-1 at ¶ 28.[4]

As Simpson recognizes, "care must be taken to ensure the response options [to close-ended questions] do not create bias." Dkt. No. 94 at 14:15-16. However, Simpson fails to address the specific bias issues in its opposition and instead exposes it further. For example, with regard to the leading questions about equivalency, source, or affiliation, Simpson simply recites MiTek's criticism but does not meaningfully dispute that these questions are leading or suggestive. *See* Dkt. No. 94 at 13:26-14:10 (citing Dkt. No. 67 at 4:21-8:26, where Simpson addresses Professor Franklyn's serving as a critiquing expert and not the improper questions in Mr. Wallace's surveys). Further, with respect to the response options, "Yes," "No," and "Don't know," Simpson fails to address the bias introduced by consistently presenting these in the same order. *See* Decl. of B. Eidson ¶ 2(a), Ex. B at 287-88 ("[T]he answer options for a question should generally be rotated or randomized across respondents to eliminate the possibility that respondents use order as a cue

---

[4] This is more akin to the improperly biased question in *Simon Prop. Grp.*, where the Court excluded a survey asking the following question, as it created demand effects: "'Do you believe that the two web pages just shown to you are put out by (a) Two unrelated sources, companies, or organizations; (b) The same source, company, or organization; (c) Related but different sources, companies, or organizations; or (d) Don't know?' If the respondent answers (a), (b), or (c), the interviewer then asks 'Why do you say that?' and 'What else?'" 104 F.Supp.2d at 1041.

to the 'correct' answer."). Rather, Simpson, missing the point, claims that the use of these questions was appropriate to "eliminate[] voluminous written responses and minimize[] interpretive burden and potential error." Dkt. No. 94 at 14:26-27. This issue is only exacerbated by the lack of adequate controls, explained further below:

> With [the] simplicity [of close-ended questions] comes acquiescence, "[T]he tendency to endorse any assertion made in a question, regardless of its content," is a systematic source of bias that has produced an inflation effect of 10% across a number of studies. Only when control groups or control questions are added to the survey design can this question format provide reasonable response estimates.

Shari S. Diamond, *Reference Guide on Survey Research*, in <u>Reference Manual on Scientific Evidence</u> 394 (3d ed.).

Similarly, Simpson skirts around the issue of bias introduced by showing respondents only the MiTek name in stimuli in the advertising portion of the surveys and subsequently asking respondents to fill-in answers in the secondary meaning portion. That is, while Simpson recognizes that the secondary meaning results show that the majority of respondents were not aware of the maker of the products, it fails to address the implication of bias, where, of the minority of participants (25 to 30 percent, or 100 to 120 participants) that did indicate awareness, "53 participants indicated Simpson and 21 indicated MiTek." *See* Dkt. No. 94 at 5:27-6:1, 7:18-20, 15:5-17.

In sum, by using inappropriately leading and suggestive questions throughout, Mr. Wallace did not comply with accepted survey principles, and this Court should exclude his surveys and opinion.

### 2. Mr. Wallace failed to use the proper survey universe or sample respondents representative of the proper universe.

Compounding the issues in the survey questions, Mr. Wallace failed to comply with accepted survey principles requiring that "proper universe(s) should be properly chosen and defined" and "[t]he sample of respondents chosen from the proper universe should be representative of that population." *See* Dkt. No. 68-1 at ¶ 15(a), (b). These principles are not met where, to begin, the survey is over-inclusive. The write-in responses highlight that the respondents

- 7 -

are unfamiliar with the industry, as many indicated they were not aware of the product names presented (and so were not asked to write-in an answer as to the maker of that product), and even those who did write-in answers, oftentimes provided nonsensical answers unrelated to the structural connector industry. *See, e.g.*, Dkt. No. 68-1 at 217 (PDF page) (results showing that respondents wrote in in answers such as "clorox co" "ZEPPIN" "lancaster colony corp"); *see also id.* at 233, 249, 265. The survey was thus over-inclusive with regard to construction industry professionals lacking knowledge about the industry.

As a separate concern, the survey was also under-inclusive by allowing only construction industry professionals, with certain titles, to participate, to the exclusion of do-it-yourself customers or others that buy items directly at big box stores regardless of their professional title. *See* Dkt. No. 68-1 at ¶ 26; *see also* Dkt. No. 86 at 106:9-110:11. Simpson cites only to unsubstantiated speculation about the percentage of (its own) sales at big box stores—without regard to MiTek's sales there—and the types of customers that shop at big box stores. *See* Dkt. No. 94 at 16:9-11, 16:15-16. Moreover, to the extent that Simpson argues that surveys may target specific groups, Dkt. No. 94 at 16:11-14, Simpson's argument is incomplete, as it fails to recognize that to the extent that a survey's target is limited, "the survey's relevance is correspondingly limited—it will show perception of consumers only in the particular group tested." Dkt. No. 95-1 at 43. Mr. Wallace similarly fails to cabin any of his survey results to the universe tested, and instead offers it as evidence of confusion among "consumers." *See* Dkt. No. 68-1 at ¶ 115.

Accordingly, Mr. Wallace chose a survey universe over-inclusive in certain respects and under-inclusive in others, both of which run afoul of the accepted survey principles.

### 3. Mr. Wallace failed to report the data gathered accurately or analyze the data in accordance with accepted statistical principles.

Finally, Mr. Wallace's results and the lack of control for survey noise speak for themselves, and Simpson does nothing more than highlight the issues in the ways in which Mr. Wallace reported and analyzed the data. *See* Dkt. No. 68-1 at ¶ 15(d), (e). For example, Simpson, and Mr. Wallace, seemingly fail to understand that the secondary meaning, or distinctiveness, control was

- 8 -

inadequate as there can be no apples-to-apples comparison without establishing a prior understanding of the Simpson brand. Dkt. No. 94 at 17:4-9. Indeed, following Mr. Wallace's logic, one essentially could have asked respondents about any combination of letters and used only their awareness of the random combination of letters to determine, comparatively, meaningful awareness of the Simpson brand. In another example, Simpson also mischaracterizes the level of net deception required in the false advertising context, citing to only a portion of the relevant authority and testimony. Dkt. No. 94 at 17:11-23. As explained in *Trademark and Deceptive Advertising Surveys*, and further by Professor Franklyn, even though there is not an established threshold for "net deception," courts have been persuaded by net deception percentages in the 50 percent range, with lower numbers around the 30s. Dkt. No. 95-1 at pp. 102-03; Decl. of B. Eidson ¶ 2, Ex. A at 64:17-68:17 ("I have never seen secondary meaning proved through a survey with net numbers lower than the 30s.").

In inadequately employing controls and accounting for survey noise, Mr. Wallace fails to comply with principles requiring that data be reported on and analyzed in accordance with accepted statistical principles.

## III.   CONCLUSION

In light of the foregoing, the Court should conclude that Mr. Wallace did not conduct his surveys in accordance with accepted survey principles and grant MiTek's motion to exclude Simpson's survey expert, Robert Wallace.

Date: October 25, 2022.                Respectfully submitted,

By: */s/ B. Scott Eidson*
Duane H. Mathiowetz (CA# 111831)
PRACTUS, LLP
201 Spear Street, Suite 1100
San Francisco, CA 94105
Phone: 415-501-0350
Email: duane.mathiowetz@practus.com

B. Scott Eidson (Pro Hac Vice)
Julie C. Scheipeter (Pro Hac Vice)
John R. Schroeder (Pro Hac Vice)
Judith Araujo (Pro Hac Vice)
STINSON LLP
7700 Forsyth Blvd., Suite 1100
St. Louis, MO 63105
Phone:  314-863-0800
Email:  scott.eidson@stinson.com
Email:  julie.scheipeter@stinson.com
Email:  john.schroeder@stinson.com
Email:  judith.araujo@stinson.com

Attorneys for Defendant MITEK INC.

- 10 -

**CERTIFICATE OF SERVICE**

I hereby certify that on October 25, 2022, I served the MITEK'S REPLY IN SUPPORT OF MOTION TO EXCLUDE PLAINTIFF'S SURVERY EXPERT, ROBERT WALLACE to counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ B. Scott Eidson