# EXHIBIT A

1    UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF CALIFORNIA

3

4

5    SIMPSON STRONG-TIE                )
     COMPANY, INC.,                    )
6                                      )
          Plaintiff,                   )
7                                      )
     v.                               )   No. 5:20-cv-06957-VKD
8                                      )
     MITEK, INC.,                      )
9                                      )
          Defendant.                   )
10                                     )
     _____       )
11

12

13

14                    CONFIDENTIAL

15    VIDEOTAPED DEPOSITION OF DAVID JOEL FRANKLYN

16                  Phoenix, Arizona

17                 September 1, 2022

18                    9:00 a.m.

19

20

21

22

23    REPORTED BY:
      Kate E. Roundy, RPR
24    Arizona Certified Reporter
      Certificate No. 50582

25

                                        Page 1

1      I am not authorized to administer an oath.  I'm

2    not related to any party in this action, nor am I

3    financially interested in the outcome.

4      Counsel and all present in the room and everyone

5    attending remotely will now state their appearances and

6    affiliations for the record, beginning with the noticing

7    attorney.

8      MR. PONIATOWSKI:  Good morning.

9    Daniel Poniatowski, Shartsis Fries, on behalf of

10   plaintiff, Simpson-Strong Tie, Inc.

11      MS. ARAUJO:  And Judith Araujo, Stinson, LLP, on

12   behalf of defendant, MiTek Inc., and the witness,

13   David Franklyn.

14      THE VIDEOGRAPHER:  And will the court reporter

15   please swear in the witness.

16

17                  DAVID JOEL FRANKLYN,

18   called as a witness herein, having been first duly sworn

19   by the Certified Court Reporter, was examined and

20   testified as follows:

21

22                      EXAMINATION

23   BY MR. PONIATOWSKI:

24      Q.   Good morning, Professor Franklyn.

25      A.   Good morning.

1    between people about various aspect -- about who puts out

2    this product, about who puts out MiTek products, about who

3    endorses it, about who sponsors it.

4           Those are trademark law principles and unfair

5    competition law principles.

6           And for him to legitimately support those

7    opinions, he needed to do, in my opinion, the proper

8    trademark surveys, and he needed to do separate proper

9    false advertising surveys to support his opinions about

10   the false adver- -- about the false advertising claims

11   that have been raised in this case.

12      Q.   Okay.  Let me ask you this.

13           You referred to the Wallace report, Exhibit 300,

14   big stack in front of you, but page 47 of that report, and

15   specifically paragraph 116.

16      A.   Uh-huh.

17      Q.   I just want to refer you to the first two

18   sentences.

19           And it says:  To my knowledge, there is no court

20   accepted percentage of net deception caused by

21   false/deceptive advertising that warrants a finding of

22   false and deceptive brand communications.

23           It is most certainty in the discretion of the

24   Court to determine the specific level of deception it

25   accepts as an indication that this deception exists

Page 64

1   throughout the relevant consuming public.

2          Do you agree with those two sentences as written?

3      A.   I do.  And I don't think they contradict what I

4   told you a minute ago, that -- to repeat, that in this

5   context of false advertising, the courts have not woven

6   together numerical benchmarks as they've done in -- in

7   trademark cases.

8      Q.   And in secondary meaning cases?

9      A.   And in second- -- well, yes, in confusion and in

10  secondary meaning, that's right.

11         There are there, you know, numbers, but he

12  can't --

13         Well, I'll let you ask the question.

14     Q.   Yeah.  Yeah.  I appreciate it.

15     A.   I -- I'll let you do your -- your thing.

16     Q.   Thank you.

17         So you have the book in front of you that we

18  marked as Exhibit 307?

19     A.   Yes.

20     Q.   Can you please refer to page 102 of that book?

21         And I'll direct you to the last paragraph on the

22  page, and the first sentence, which reads:  There is no

23  well-defined threshold for establishing secondary meaning

24  leaving interpretation to the discretion of the finders of

25  fact in each case.

Veritext Legal Solutions
866 299-5127

1          Do you agree with that sentence?

2     A.    Not entirely.

3     Q.    Okay.  In what way do you disagree with that?

4     A.    Well, I -- I teach this and I study this and I

5     think there is no absolute threshold that has been

6     uniformly numericalized for establishing secondary meaning

7     if a survey has been done.

8          But -- and -- and, therefore, it -- it can be

9     looked at on a case-by-case basis.

10         But, if you look at the rest of it, in that

11    paragraph, she alludes to more or less what I was saying,

12    which is courts have been persuaded by a single source

13    response of at least 50 percent net named and anonymous,

14    numbers in the 30s have been deemed marginal, but have

15    been accepted in some cases.

16         If more than half of the single-source responses

17    are merely anonymous or incorrectly identified, the

18    findings may, in fact, be deemed insufficient for that

19    reason alone, which is an issue in this case.

20         Even if a net 42 percent correct score

21    identified -- identification was not, in and of itself,

22    sufficient to establish secondary meaning for an

23    illustration of the Hershey 4-by-3 chocolate bar panel

24    design because imprint patterns that delineate or

25    facilitate serving portions were deemed to have some

Veritext Legal Solutions
866 299-5127

1    functionality, but in the context of other relevant

2    factors the survey was ultimately found to be persuasive.

3              And then you see 33 percent.  I have never seen

4    secondary meaning proved through a survey with net numbers

5    lower than the 30s.

6              So I haven't seen it, for example, with like

7    10 percent or 3 percent or 20 percent.

8              And so when my students ask me is there a

9    benchmark, I basically reiterate everything she said here,

10   and, you know -- and that's --  I agree with her, if you

11   read it all in context.

12             But I -- I do not think it could be read out of

13   the context to say, therefore, extremely low numbers are

14   likely to get it.

15             You know.  I mean, I won't -- if you take -- if

16   you take --  Excuse me.

17             I was once asked to do a secondary meaning survey

18   for the color black for a mat for the box that was used to

19   sell a Kimberly-Clark brand of feminine napkins, and a

20   competitor had started selling them in a similar color box

21   and -- under a different name, and Kimberly-Clark wanted

22   to know what they could do to prove secondary meaning in

23   their color.

24             And a survey showed that only about 10 percent of

25   women associated with the single source, and it was not

Veritext Legal Solutions
866 299-5127

1 considered by anybody to be sufficient evidence of

2 secondary meaning.

3    You know, 5 percent of the public associates a

4 color or a name or in this case a -- a product description

5 with a particular source and half of those people can't

6 name the source, in my opinion, which is all I'm giving

7 here, that's not enough.

8    Because secondary meaning means that a

9 substantial, if not majority part, of the relevant

10 consuming public has come to see a product feature or

11 attribute as part of the brand of the company and not

12 merely as communicative information.

13    And that needs to be in order, then, to award

14 trademark rights, the courts have definitely imposed

15 through the case law development an elevated requirement.

16    So -- so, yes, I agree with her statement in

17 context.

18  Q. Professor Franklyn, I'd like to ask you about

19 another statement in this book on page 329.

20    MS. ARAUJO:  I will forgive you for not bringing

21 me my own book, Daniel, but next time.

22    MR. PONIATOWSKI:  Yeah.  From the law library --

23    THE WITNESS:  Did you buy -- did you buy this?

24    MR. PONIATOWSKI:  That's from the Hastings law

25 library, if you look at the top.

Veritext Legal Solutions
866 299-5127