# EXHIBIT B

# TRADEMARK and DECEPTIVE ADVERTISING SURVEYS

## SECOND EDITION

### Law, Science, and Design

**Shari Seidman Diamond**
and **Jerre B. Swann**
Editors


AMERICAN BAR ASSOCIATION
Intellectual Property Law Section


Franklyn
EXHIBIT 307
DATE 9-1-27
Kate E. Roundy, CR 50582

TRADEMARK and DECEPTIVE ADVERTISING SURVEYS, Second Edition

Shari Seidman Diamond
Jerre B. Swann, Editor

KF 3193 .T725 2022

HASTINGS LAW LIBRARY

3 5012 00219 6339

# TRADEMARK and DECEPTIVE ADVERTISING SURVEYS

SECOND EDITION

Law, Science, and Design

**Shari Seidman Diamond**
and **Jerre B. Swann**
Editors


RECEIVED
APR 19 2022
UC HASTINGS
LAW LIBRARY



AMERICAN**BAR**ASSOCIATION
Intellectual Property
Law Section

Cover design by Jill Tedhams/ABA Design

The materials contained herein represent the opinions of the authors and/or the editors and should not be construed to be the views or opinions of the law firms or companies with whom such persons are in partnership with, associated with, or employed by, nor of the American Bar Association or the Section of Intellectual Property Law, unless adopted pursuant to the bylaws of the Association.

Nothing contained in this book is to be considered as the rendering of legal advice for specific cases, and readers are responsible for obtaining such advice from their own legal counsel. This book is intended for educational and informational purposes only.

© 2022 American Bar Association. All rights reserved.

No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of the publisher. For permission, complete the request form at www.americanbar.org/reprint or email ABA Publishing at copyright@americanbar.org.

Printed in the United States of America.

26 25 24 23 22     5 4 3 2 1

A catalog record for this book is available from the Library of Congress.

Discounts are available for books ordered in bulk. Special consideration is given to state bars, CLE programs, and other bar-related organizations. Inquire at Book Publishing, ABA Publishing, American Bar Association, 321 N. Clark Street, Chicago, Illinois 60654-7598.

www.shopABA.org

# CONTENTS

AUTHOR BIOGRAPHIES ... XI

**SECTION I  INTRODUCTION** ... 1

1  EDITORS' INTRODUCTION TO THE SECOND EDITION: SURVEYS IN MODERN LITIGATION INVOLVING TRADEMARKS AND DECEPTIVE ADVERTISING ... 3

THE CHAPTERS ... 8
DEDICATION ... 8

**SECTION II  PRELIMINARY MATTERS** ... 11

2  THE USE OF PILOT TESTS AND PRETESTS IN CONSUMER SURVEYS ... 13
*By Ivan Ross*

INTRODUCTION ... 13
THE EXPERT AND THE ATTORNEY: DIFFERENT
  PERSPECTIVES ON THE VALUE OF PILOT TESTS ... 16
AN EXAMPLE OF THE VALUE OF PILOT WORK ... 18
TYPICAL RESEARCH PARAMETERS STUDIED IN PILOT TESTS ... 19
  The Questionnaire ... 20
  Universe Specification, Sampling Issues, and Incentives ... 22
  Mechanical, Administrative, and Logistical Considerations ... 23
HOW LIKELY IS IT THAT PILOT WORK WILL BE HELPFUL? ... 25
  Piloting Usually Provides at Least Some Helpful Information ... 25
  Circumstances in Which Pilot Work Is More Likely to Be Helpful ... 25
  Circumstances When a Pilot Test Is Less Likely to Be Helpful ... 26
PILOT TEST IMPLEMENTATION CONSIDERATIONS ... 26
  Pilot Survey Sample Size ... 26
  How Many Parameters Can Be Evaluated at the Same Time? ... 27
  Pilot Study Timing ... 27
  How Many Pilot Tests? ... 27
CONCLUDING THOUGHTS ... 27

EDITORS' NOTE ... 29

| | | |
|---|---|---|
| **3** | **THE UNIVERSE** | **31** |

*By William G. Barber and Giulio E. Yaquinto*

| | |
|---|---|
| DETERMINING THE PROPER UNIVERSE | 32 |
| Forward Confusion | 32 |
| Reverse Confusion | 35 |
| Post-Sale Confusion | 35 |
| Distinctiveness/Strength | 36 |
| Dilution Issues | 38 |
| False Advertising | 41 |
| Special Rules | 42 |
| ERRORS IN DEFINING THE UNIVERSE | 45 |
| Overinclusiveness | 45 |
| Underinclusiveness | 49 |
| Overinclusive and Underinclusive | 51 |
| Judicial Nit-Picking | 51 |
| SAMPLING AND SCREENING THE UNIVERSE | 54 |
| Sampling | 54 |
| Screening | 55 |
| CONCLUSION | 56 |

| | | |
|---|---|---|
| **SECTION III** | **LEGAL QUESTIONS** | **57** |
| **4** | **LIKELIHOOD-OF-CONFUSION SURVEYS** | **59** |

*By Jerre B. Swann*

| | |
|---|---|
| UNION CARBIDE AND THE EVER-CONSTANT EVEREADY FORMAT | 60 |
| THE COGNITIVE UNDERPINNINGS OF THE EVEREADY FORMAT | 61 |
| *Squirtco* and the Ever-Evolving Squirt Format | 65 |
| The Cognitive Underpinnings of the Squirt Format | 72 |
| COMPETITIVE PROXIMITY AND THE INTERNET | 73 |
| CONCLUSIONS AS TO THE EVEREADY AND SQUIRT FORMATS | 76 |
| OTHER FORMATS | 77 |
| EVEREADY AND SQUIRT STIMULI | 78 |
| CONCLUSION | 78 |

| | | |
|---|---|---|
| **5** | **SECONDARY MEANING SURVEYS** | **79** |

*By Susan Schwartz McDonald*

| | |
|---|---|
| CONCEPTS AND CONTEXT | 79 |
| What Is Secondary Meaning? | 79 |
| The "Anonymous Source" Concept | 79 |
| Secondary Meaning in Marketplace Context | 80 |
| Neighboring Concepts | 82 |
| The Importance of Survey Evidence | 84 |
| RULES OF THE ROAD FOR SECONDARY MEANING SURVEYS | 85 |
| "Visibility" Conditions | 85 |
| The Fundamentals: Surveys and Experimental Surveys | 85 |

| | |
|---|---|
| THE SECONDARY MEANING ROAD MAP | 87 |
| Universe Definition: The "Relevant" Consuming Public | 87 |
| Sample Size Guidelines | 90 |
| The Operative Survey Questions | 94 |
| Devising and Presenting Stimuli and Controls | 99 |
| Secondary Meaning Calculation and Threshold Requirements | 102 |
| A Postscript on Secondary Meaning Measurement: Unpacking "Association" | 104 |

| | | |
|---|---|---|
| **6** | **GENERICNESS SURVEYS IN TRADEMARK DISPUTES: UNDER THE GAVEL** | **107** |

*By E. Deborah Jay*

| | |
|---|---|
| INTRODUCTION | 107 |
| THE SURVEYS IN *AMERICAN THERMOS* | 112 |
| THE SURVEYS IN *E. I. DU PONT DE NEMOURS* | 113 |
| THERMOS SURVEYS AFTER *AMERICAN THERMOS* | 116 |
| TEFLON SURVEYS AFTER *E. I. DU PONT DE NEMOURS* | 120 |
| The Brand-Name/Common-Name Dichotomy | 123 |
| Screening Respondents | 125 |
| Question Wording | 127 |
| Frame of Reference | 130 |
| Comparison Names | 131 |
| Rotation of Items and Response Categories | 134 |
| Survey Analysis | 135 |
| ALTERNATIVES TO THE THERMOS AND TEFLON FORMATS | 137 |
| Consumer-Recognition Surveys | 138 |
| Source-Identification and Brand-Association Surveys | 138 |
| Permission or Approval Surveys | 142 |
| Statement-of-Meaning Surveys | 142 |
| SURVEY EVIDENCE AND DESCRIPTIVE OR GENERIC ".COM" MARKS | 143 |
| Booking.com and Purportedly Generic ".com" Marks | 145 |
| OTHER SURVEY ISSUES | 147 |
| The Role of Experts and Attorneys in Surveys | 147 |
| Universe Selection and Sample Size | 148 |
| Data Collection Methods | 153 |
| Visual Stimuli | 155 |
| Survey Reporting | 157 |
| Countering a Genericness Survey | 157 |
| CONCLUSION | 161 |

| | | |
|---|---|---|
| **7A** | **SURVEYS IN DILUTION CASES** | **163** |

*By Shari Seidman Diamond*

| | |
|---|---|
| FAME SURVEYS | 164 |
| ASSOCIATION SURVEYS | 166 |
| ASSESSING LIKELIHOOD OF DILUTION BY BLURRING AFTER FINDING FAME AND ASSOCIATION | 168 |

ASSESSING LIKELIHOOD OF DILUTION BY TARNISHMENT
AFTER FINDING FAME AND ASSOCIATION ... 171
CONCLUSION ... 172

**7B SWANN'S RESPONSE TO DIAMOND RE DILUTION SURVEYS ... 175**
By Jerre B. Swann

THE SCHECHTER CONSTRUCT ... 176
THE EVOLUTION OF TRADEMARKS IN THE SECOND HALF
OF THE 20TH CENTURY ... 179
CONCLUSION ... 184

**8 SURVEY EVIDENCE IN FALSE ADVERTISING CASES ... 187**
By David H. Bernstein and Bruce P. Keller

WHEN SURVEYS ARE USED IN ASSESSING FALSE
ADVERTISING CLAIMS ... 187
Advertisements That Are Literally False ... 188
Advertisements That Are False by Necessary Implication ... 190
Advertisements That Are Misleading ... 192
SURVEY EVIDENCE AND NONACTIONABLE ADVERTISEMENTS ... 195
SURVEYS AS SUBSTANTIVE EVIDENCE OF TRUTH OR FALSITY ... 201
Comparative Taste Tests ... 203
Preference and "Recommended" Claims ... 204
CONSTRUCTION OF SURVEYS ... 207
Survey Standards ... 208
Universe and Sampling ... 209
Double-Blind Surveys ... 212
Control Groups—Separating Out Preexisting Beliefs,
Bias, and Other Sources of Noise ... 212
Examples of Properly Structured Control Groups ... 215
Examples of Improperly Structured Control Groups ... 216
Filter Questions ... 219
"Don't Know" Option ... 220
Open-Ended Questions ... 220
Open-Ended Questions as Funnels ... 222
Relevance to Closed-Ended Questions ... 224
Order Bias ... 227
A Final Thought ... 227
WEIGHT AND ADMISSIBILITY OF SURVEY EVIDENCE ... 227
INTERNET-BASED SURVEYS ... 231
CONCLUSION ... 235

**SECTION IV CONTROLS ... 237**

**9 CONTROL FOUNDATIONS: RATIONALES AND APPROACHES ... 239**
By Shari Seidman Diamond

INTRODUCTION ... 239

THREATS TO INTERNAL VALIDITY AND SOURCES
OF MEASUREMENT ERROR ... 241
Preexisting Beliefs ... 242
Yea-Saying ... 242
Guessing That Produces Random Error ... 243
Guessing That Produces Systematic Error ... 243
A CLOSER LOOK AT SURVEY DESIGN WITHOUT
AND WITH CONTROLS ... 244
Without Controls ... 244
With Controls ... 247
CHOOSING APPROPRIATE CONTROLS ... 248
Selecting a Control That Shares Features with the Test Stimulus
That Are Not at Issue ... 250
Avoiding Cues in the Control That Artificially
Depress "Confusion" Responses ... 251
Selecting a Control Mark That Would Plausibly Be Used
in the Same Product Category ... 252
Avoiding a Control That Is Itself Infringing ... 252
THE ROLE OF MULTIPLE CONTROLS ... 254
CONCLUSION ... 254

**10 DESIGN ISSUES AND THE VALUE OF MULTIPLE CONTROLS ... 257**
By Mike Rappeport

INTRODUCTION ... 257
SURVEY DATA ... 258
Surveys Are Inherently Leading (A Survey Artifact) ... 258
Other Types of Noise (Survey Artifacts) ... 259
Preconceptions ... 259
GOOD DESIGN—THE CONCEPT OF CONTROLS ... 260
DESIGNING CONTROLS: SURVEY RESEARCH AS ENGINEERING ... 261
GENERAL PRINCIPLES FOR DESIGNING CONTROLS ... 262
THE CASE OF FALSE ADVERTISING ... 264
TWO REAL EXAMPLES ... 265
A False Advertising Example—McDonald's versus Wendy's ... 265
A Trade Dress Example: *Kind v. Clif* ... 267
ANALYSIS OF CONTROL CELL DESIGNS
WITH MULTIPLE CONTROLS ... 268

**SECTION V OTHER METHODOLOGICAL ISSUES ... 271**

**11 PSYCHOLOGICAL CONSIDERATIONS IN DESIGNING TRADEMARK
AND FALSE ADVERTISING SURVEY QUESTIONNAIRES ... 273**
By David T. Neal

INTRODUCTION ... 273
A PRIMER ON THE PSYCHOLOGY OF SURVEY RESPONDING ... 275

BIASES ORIGINATING IN PREEXISTING PSYCHOLOGICAL
  TENDENCIES OF THE SURVEY RESPONDENT 276
  Guessing 276
  Yea-Saying/Acquiescence Bias 277
  Imperfect Recall 278
  Social Desirability/Compliance 279
  Preexisting Beliefs 280
  Introspective Bias 281
BIASES ORIGINATING IN THE OVERALL STRUCTURE, CONTENT,
  OR SEQUENCING OF SURVEY CONTENT 281
  Limited Attention and Fatigue 281
  Source/Affiliation Bias 283
  Priming Effects 284
BIASES ORIGINATING WITHIN A SPECIFIC SURVEY QUESTION 286
  Ambiguous Questions 286
  Leading Questions 287
  Double-Barreled Questions 288
  Response Format Biases 288
CONCLUSION 289

12  **INTERNET SURVEYS IN TRADEMARK CASES: BENEFITS,
    CHALLENGES, AND SOLUTIONS**  **291**
*By Matthew B. Kugler and R. Charles Henn Jr.*

PREVALENCE AND ACCEPTANCE OF INTERNET SURVEYS 292
BENEFITS OF CONDUCTING SURVEYS ONLINE 296
  Benefits of Internet Panel Recruitment 296
  Benefits for Survey Administration 298
ENSURING AN HONEST AND ATTENTIVE SAMPLE
  OF RESPONDENTS ONLINE 300
  Panel Level Checks and Participant Verification 300
  Attention within the Survey 301
  Reliability of Data Overall: The Replication Crisis 307
ONLINE METHODS TO ENSURE A REPRESENTATIVE SAMPLE 308
CONSIDERATIONS SPECIFIC TO TRADEMARK
  AND TRADE DRESS SURVEYS 311
  Mobile Devices 311
  Presentation of Particular Stimuli 312
CONCLUSIONS 314

**SECTION VI  RESPONSES TO SURVEY RESULTS  315**

13  **SURVEY PERCENTAGES IN LANHAM ACT MATTERS**  **317**
*By Matthew G. Ezell and AnnaBelle Sartore*

INTRODUCTION 317
LIKELIHOOD-OF-CONFUSION SURVEYS 319
SECONDARY MEANING SURVEYS 322

GENERICNESS SURVEYS 325
FALSE ADVERTISING SURVEYS 327
FAME SURVEYS 330
LIKELIHOOD-OF-DILUTION SURVEYS 332
  Dilution Surveys—January 16, 1996, through March 4, 2003 333
  Dilution Surveys—March 5, 2003, through October 6, 2006 333
  Dilution Surveys—October 7, 2006, through December 31, 2020 333
CONCLUSION 334

14  **THE *DAUBERT* REVOLUTION AND LANHAM ACT SURVEYS**  **337**
*By G. Kip Edwards and J. David Mayberry*

INTRODUCTION 337
THE SUPREME COURT AND EXPERT EVIDENCE 339
  The *Daubert* Decision 339
  *Kumho* 341
  The Amendments to Rule 702 343
PROCEDURAL ASPECTS OF *DAUBERT* 344
*DAUBERT* CHALLENGES TO LANHAM ACT SURVEY EVIDENCE 346
  Survey Universe 348
  Sample Size and Related Issues 351
DEFINITIONS 353
PRESENTING THE STIMULUS AND REPLICATING MARKET
  CONDITIONS 354
PROBLEMS WITH THE SURVEY QUESTIONS 357
THE NEED FOR CONTROLS 363
EXPERT TESTIMONY UNSUPPORTED BY SURVEY EVIDENCE 366
CONCLUSION 370

15  **SURVEY CRITIQUES**  **371**
*By Jerre B. Swann*

HOW A CRITIQUE SHOULD NOT BE DONE 372
GENERAL GUIDELINES FROM THE FIRST EDITION 375
  Critiques as to Technical Matters Should Bear Little (If at All)
    on the Weight Given a Survey 375
  Critiques as to Substantive Flaws Should Turn on the Impact
    of the Flaw on Relevance or Reliability, Not
    on the Label Attached to the Flaw 379
  True Candidates for Fatal Flaw Treatment,
    without Extensive Analysis or Supporting Data 381
CONCLUSION 383

**INDEX**  **385**

of autobiographical memory, in which recalling one event is likely to facilitate recall of the next, more recent, event in memory.[59]

Third, it is useful to remember that human beings are motivated to express opinions that are consistent over time. Whether by accident or design, surveys can fall afoul of this consistency bias by nudging respondents to give responses they may not otherwise give, just to avoid contradicting prior answers they provided.[60] Finally, even seemingly cosmetic elements of a survey, such as the colors used, can prime later answers (e.g., particular shades of blue might prompt people to think of UNC-Chapel Hill in the context of universities or Tiffany & Co. in the context of jewelry).[61] Thus, unless certain colors, visuals, or context are necessary to replicate market conditions, any extraneous details or information should be generally be removed in favor of a minimalist approach.

## BIASES ORIGINATING WITHIN A SPECIFIC SURVEY QUESTION

This final section reviews key types of bias that can emerge within a specific survey question itself. The four primary factors in this category are (a) ambiguous questions, (b) leading questions, (c) double-barreled questions, and (d) response format biases.

### Ambiguous Questions

Poorly constructed questions (i.e., ones that are vague or excessively complex or that have multiple interpretations) do not necessarily introduce systematic bias into a survey but add harmful "noise" or random error into the data. This, in turn, can compromise a survey's reliability and validity because it becomes difficult to know whether the results reflect a true signal (e.g., the presence or absence of confusion) or merely excessive background noise and poor measurement.

To avoid this, surveys should take care to avoid grammatical ambiguity, excessive complexity, vague quantifiers, and undefined terms.[62] For example, questions such as "Are you using X product?" can have a variety of meanings (Does "using" mean "using" X product in real-time? Does it mean "using" X product at specific time? Or "using" X product in a specific place?). Each respondent may interpret the question in a slightly different way, adding noise into the data. Similarly, ambiguity can emerge in the response options provided to respondents. Quantifiers such as "very often" or "sometimes" can be problematic in trademark and false advertising surveys because they can mean different things to different people and do not map consistently to any

---

59. Robert F. Belli, *The Structure of Autobiographical Memory and the Event History Calendar: Potential Improvements in the Quality of Retrospective Reports in Surveys*, 6 MEMORY 383–406 (1998).
60. Armin Falk & Florian Zimmermann, *A Taste for Consistency and Survey Response Behavior*, 59 CESIFO ECON. STUD. 181–93 (2013).
61. Roger Tourangeau, Mick P. Couper, & Frederick Conrad, *Color, Labels, and Interpretive Heuristics for Response Scales*, 71 PUB. OPINION Q. 91–112 (2007).
62. TOURANGEAU, RIPS, & RASINSKI, *supra* note 21, at 61.

objective real-world consumer behavior. For example, buying books "often" may mean purchasing two books per month for one respondent but two books per year for another respondent. Finally, unfamiliar terms or technical concepts should be clearly defined. Research suggests that definitions may be ignored if they are not provided directly in the question (e.g., if they are provided as a hyperlink).[63] Thus, it is wise to include the definition in the question stem when possible.[64] Moreover, research shows that providing examples or clear definitions can help respondents correctly interpret vague terms,[65] thereby reducing noise.[66]

### Leading Questions

A leading question is one that implies, either directly or indirectly, that a certain answer is more accurate, proper, or normatively acceptable than other answers.[67] Demonstrating the biasing power of leading questions, a classic study on eyewitness testimony had respondents watch video recordings of a traffic accident. Respondents were later randomly assigned to be asked "About how fast were the cars going when they hit each other?" or the same question with the word "hit" being replaced by either "smashed," "collided," "bumped," or "contacted."[68] Even though all respondents watched identical videos, respondents in the "smashed" group, for example, estimated significantly higher speeds than respondents in the "hit" group.

Some of the methods described elsewhere in this chapter (e.g., instructing respondents not to guess, avoiding value-laden language, providing "don't know" responses, avoiding priming effects) can also help in the quest to avoid leading questions. Other principles, however, should also be followed. First, critical questions should generally give equal emphasis to the affirmative, negative, and neutral positions on the subject of inquiry.[69] Sometimes this creates cumbersome questions that are difficult to comprehend. At a minimum, a question should not give more emphasis to the side commissioning the survey or fail to include options that fairly represent the opponent's position.[70] Second, as discussed under the response format biases section

---

63. Frederick G. Conrad et al., *Use and Non-use of Clarification Features in Web Surveys*, 22 J. OFFICIAL STATS. 245 (2006).
64. Roger Tourangeau, *The Survey Response Process from a Cognitive Viewpoint*, 26 QUALITY ASSURANCE IN EDUCATION 169–81 (2018).
65. Roger Tourangeau et al., *Examples in Open-ended Survey Questions*, 29 INTL. J. PUB. OPINION RES. 690–702 (2017).
66. Again, however, the decision to provide detailed definitions and information must be considered in the context of replicating marketplace conditions. As a general rule, the objective should be to make respondents as informed as (i.e., neither more nor less informed than) actual consumers in the relevant marketplace.
67. TOURANGEAU, RIPS, & RASINSKI, *supra* note 21.
68. Elizabeth F. Loftus & John C. Palmer, *Reconstruction of Automobile Destruction: An Example of the Interaction between Language and Memory*, 13 J. VERBAL LEARNING & VERBAL BEHAVIOR 585–89 (1974).
69. Jacob Jacoby, *Are Closed-ended Questions Leading Questions?*, in SHARI SEIDMAN DIAMOND & JERRE B. SWANN (EDS.), TRADEMARK AND DECEPTIVE ADVERTISING SURVEYS: LAW, SCIENCE, AND DESIGN 261–84 (1st ed. 2012).
70. *Id.*

below, the answer options for a question should generally[71] be rotated or randomized across respondents to eliminate the possibility that respondents use order as a cue to the "correct" answer.

## Double-Barreled Questions

Consider the following question: "Do you agree that the flu can be transmitted by shaking hands with a person with the flu or through other means of physical contact?" Both "yes" and "no" responses can have multiple meanings. For example, a "yes" response may mean the respondent believes the flu is transmitted by shaking hands, that the flu is transmitted through other means of physical contact, or both.[72] Thus, the question is double-barreled—that is, it involves two independent but compounded clauses, "shaking hands" and "other means of physical contact." Aside from being confusing to respondents, such questions can make it impossible to know whether a respondent is affirming or rejecting one or both clauses, or what their response might be to each clause presented independently. To resolve this, double-barreled questions should simply be divided into separate questions, thus allowing the respondent to opine on each clause independently.

## Response Format Biases

Just as a question can create bias, so too can the response options that accompany it. Concerns about response format bias can be addressed through the use of open-ended questions (where no responses are provided), but open-ended data requires human coding that is often qualitative in nature and may be vulnerable to interpretive burden and the challenges of making judgments on complex data.[73] Accordingly, closed-ended questions are heavily relied upon, and care must be taken to ensure the response options used do not create bias. Attesting to the subtle but powerful nature of these effects, one study showed that, when asked which food was "typically German" from a list of foods (potatoes, rice, and noodles), respondents were significantly more likely to choose "potatoes" when it was followed by "rice" compared with when it was preceded by "rice."[74] Thus, the mere order of response options influenced the answers people gave.

To remedy response format effects, answers should generally be randomized or counterbalanced across respondents.[75] In randomization, response options are truly random across questions even within a single respondent. In counter-balancing, response options are randomized *across* respondents, but follow a pattern *within* respondents (e.g., affirmative responses to questions always appear first for some respondents and second for others). Both methods remove any impact from respondents who happen to choose options that are higher or lower on a list. Eye-tracking research has shown, for example, that survey respondents generally pay less attention as they move from the first to last response options.[76]

In addition to considering the order of response options, the content and number of response options provided are also important. In a classic study, researchers asked people how many hours they spent watching TV on an average day using one of the two different response formats shown below:[77]

| 1. Low-frequency scale: | 2. High-frequency scale: |
|---|---|
| Up to ½ hour | Up to 2½ hours |
| ½ to 1 hour | 2½ to 3 hours |
| 1 to 1½ hours | 3 to 3½ hours |
| 1½ to 2 hours | 3½ to 4 hours |
| 2 to 2½ hours | 4 to 4½ hours |
| More than 2½ hours | More than 4½ hours |

Respondents' answers to the question differed based on the response scale provided to them. That is, they provided lower estimates when given the low-frequency scale and higher estimates when given the high-frequency scale. Fortunately, such effects may primarily be of concern when the behavior in question is sensitive in nature (e.g., excessive TV watching is normatively undesirable) and when the task involves complex recall of past events (see earlier discussion of memory effects).[78] Nonetheless, it is advisable to ensure that response scales provide reasonable coverage of the distribution of possible answers people might plausibly give and do so in a way that is not skewed too high or low.

## CONCLUSION

This chapter provides a roadmap, anchored in psychology and cognitive science, for successfully navigating some of the most common biases and design flaws in trademark and false advertising surveys. We first reviewed biases that stem primarily from the psychological states of survey respondents themselves, including guessing,

71. Response options that are inherently ordered (e.g., age, time, money) are an exception to this rule, as are options that respondents are accustomed to seeing in a specific order (e.g., alphabetical lists of states or countries).
72. Bernard C.K. Choi & Anita W.P. Pak, *Peer Reviewed: A Catalog of Biases in Questionnaires*, 2 PREVENTING CHRONIC DISEASE A13 (2005).
73. Daniel J. Hruschka et al., *Reliability in Coding Open-ended Data: Lessons Learned from HIV Behavioral Research*, 16 FIELD METHODS 307–31 (2004).
74. Elisabeth Noelle-Neumann, *Wanted: Rules for Wording Structured Questionnaires*, 34 PUB. OPINION Q. 191–201 (1970).
75. Note that there are circumstances in which response options and/or stimuli (e.g., pictures of a product) should not be randomized. For example, if people in the relevant real-world context would likely see aspects of a product in a specific order, then that order might be replicated in the survey rather than using randomization.
76. Mirta Galesic et al., *Eye-Tracking Data: New Insights on Response Order Effects and Other Cognitive Shortcuts in Survey Responding*, 72 PUB. OPINION Q. 892–913 (2008).
77. Norbert Schwarz et al., *Response Scales: Effects of Category Range on Reported Behavior and Comparative Judgments*, 49 PUB. OPINION Q. 388–95 (1985).
78. TOURANGEAU, RIPS, & RASINSKI, *supra* note 21.