UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SIMPSON STRONG-TIE COMPANY INC., <br><br> Plaintiff, <br><br> v. <br><br> MITEK INC., <br><br> Defendant. | Case No. 20-cv-06957-VKD <br><br> **ORDER RE *DAUBERT* MOTIONS TO EXCLUDE EXPERT WITNESS TESTIMONY** <br><br> Re: Dkt. Nos. 67, 76 |

Plaintiff Simpson Strong-Tie Company Inc. ("Simpson") asserts the following claims against defendant MiTek Inc. ("MiTek"): (1) false advertising under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B); (2) false advertising under California Business & Professions Code § 17500; (3) passing off under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); (4) unfair competition under California Business & Professions Code § 17200; and (5) copyright infringement under 17 U.S.C. § 106. Dkt. No. 1. A bench trial is set for February 6, 2023. MiTek moves to exclude evidence from Simpson's survey expert Rob Wallace. Dkt. No. 76. Simpson moves to exclude evidence from MiTek's rebuttal expert David Franklyn. Dkt. No. 67. The Court held a hearing on these motions on November 8, 2022. Dkt. Nos. 113, 115. In consideration of the parties' submissions and oral argument, the Court denies MiTek's motion in part and grants it in part, and denies Simpson's motion in part and grants it in part.

I.  **BACKGROUND**

Simpson manufactures and sells structural connectors for use in building construction. Simpson assigns alphanumeric product names for each of its products. Dkt. No. 78-9 at 32. Each

product name has a "part name" consisting of a letter or combination of letters designating the product line, and a "model number" consisting of additional numbers and letters appended to the part name to distinguish between various models of a particular part with different attributes. Dkt. 71-48 at 37. Simpson uses its product names on its website and product packaging, as well as in catalogs, publications, and other advertising materials, including its Wood Construction Connectors Catalog.

MiTek also manufactures and sells construction products, including structural connectors that compete with Simpson's. Dkt. No. 78-9 at 32. According to Simpson, MiTek uses product names that are identical or similar to Simpson product names and also uses Simpson's product names as "reference numbers" for MiTek's own products. See Dkt. No. 71-9. Simpson challenges these uses of its product names on MiTek's website and in its mobile phone application, catalogs, labels, and other materials, arguing that MiTek deceives consumers into believing that the companies' products are equivalent or interchangeable when they are not, or that MiTek's products are actually Simpson's products.

Simpson retained Mr. Wallace as a survey and brand communications expert. Dkt. No. 84 ¶¶ 2-5. Mr. Wallace conducted four surveys and prepared a report explaining his findings. *Id.* ¶ 2. Each survey exposed respondents to one of four stimuli: a page of MiTek's catalog, a webpage from MiTek's website, a MiTek product label, and MiTek's "Conversion Guide." *Id.* The surveys also exposed respondents to Simpson's product names. Through these surveys, Mr. Wallace attempted to determine: (1) If Simpson's product names are widely known; (2) if the use of Simpson's product names on MiTek's product labels and advertising causes the relevant consuming public to believe that the two companies' products are equivalent and/or have the same attributes; (3) if the use of Simpson's product names on MiTek's product labels and advertising cause the relevant consuming public to believe the sources of these products are the same or affiliated with one another; (4) if the use of Simpson's product names on MiTek's product labels and advertising causes the relevant consuming public to believe Simpson endorses MiTek's reference to Simpson's product; and (5) if confusion regarding these issues affects the purchasing decisions of customers and diverts sales from Simpson to MiTek. *Id.* For each of the surveys, Mr.

2

Wallace presented pre-screened respondents with one of the four stimuli. *Id.* ¶ 26. Respondents were then asked questions about the stimulus. *Id.* ¶¶ 28-91. Each test group was comprised of 100 respondents. *Id.*

MiTek retained Professor Franklyn as a survey expert solely to review and critique Mr. Wallace's evidence. Professor Franklyn prepared a report explaining his critique. Dkt. No. 68-2.

## II.   LEGAL STANDARD

The parties do not dispute the legal framework the Court must apply. An expert witness may testify to an opinion if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. "Rule 702 imposes a 'basic gatekeeping obligation' on district courts to 'ensure that any and all scientific testimony'—including testimony based on 'technical[ ] or other specialized knowledge'—'is not only relevant, but reliable.'" *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1035–36 (9th Cir. 2010) (quoting *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147 (1999)).

The Court's duty is to evaluate the soundness of the expert's methodology, not the correctness of the expert's conclusions. *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010). "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Id.* With respect to survey evidence, the Ninth Circuit has set a low bar: "Survey evidence should be admitted 'as long as it is conducted according to accepted principles and is relevant.'" *Fortune Dynamic,* 618 F.3d at 1036 (quoting *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997)). "'[T]echnical inadequacies' in a survey, 'including the format of the questions or the manner in which it was taken, bear on the weight of the evidence, not its admissibility.'" *Id.* (quoting *Keith v. Volpe*, 858 F.2d 467, 480 (9th Cir. 1988)). Survey evidence may be excluded where its proponent fails to show that the survey was conducted in accordance with accepted survey principles. *See M2 Software, Inc. v. Macacy Entm't*, 421 F.3d 1073, 1087 (9th Cir. 2005); *Keith*, 858 F.2d at 480.

### III.     MITEK'S MOTION TO EXCLUDE WALLACE TESTIMONY

MiTek does not challenge Mr. Wallace's qualifications as an expert. Instead MiTek argues that Mr. Wallace's testimony should be excluded because his survey evidence is not reliable. Dkt. No. 76. Specifically, MiTek argues that Mr. Wallace used improper and unreliable survey methodology by asking suggestive and leading questions throughout his surveys. MiTek also argues Mr. Wallace used an inadequate universe of survey participants and that he failed to use proper controls in conducting the surveys. "Admissibility of a survey is a threshold question that must be resolved by a judge." *M2 Software,* 421 F.3d at 1087 (9th Cir. 2005).

#### A.     Survey Methodology

MiTek argues that Mr. Wallace failed to use an accepted survey methodology. Dkt. No. 76 at 6. The parties dispute whether Mr. Wallace used, or attempted to use, an *Eveready*-type[1] survey methodology, the *Squirt*-type[2] survey methodology, or some other methodology. Simpson argues that in false advertising cases such as this, the *Eveready* and *Squirt* methodologies do not necessarily apply, and that the survey used must be tailored to the nature of the advertising claim at issue. Dkt. No. 94 at 12. MiTek appears not to disagree, but contends that Mr. Wallace's efforts failed to comport with certain fundamental principles applicable to *any* acceptable survey methodology, rendering his survey results unreliable. Dkt. No. 108 at 2-3.

Where there is no single, generally accepted methodology, the distinction between admissible and inadmissible survey evidence is difficult to make. Certainly, a survey may be so poorly constructed, executed, or analyzed that its results are not reliable. *See, e.g., Superior Consulting Servs., Inc. v. Shaklee Corp.*, No. 19-10771, 2021 WL 4438518, at *12 (11th Cir. Sept. 28, 2021). And yet, the Ninth Circuit has repeatedly cautioned district courts against excluding (rather than appropriately weighing) even seriously flawed survey evidence. *See Fortune Dynamic*, 618 F.3d at 1036; *Clicks Billiards, Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1263

---

[1] *See Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366 (7th Cir. 1976)

[2] *See SquirtCo. v. Seven–Up Co.*, 628 F.2d 1086 (8th Cir. 1980)

(9th Cir. 2001). Here, MiTek's principal argument is that Mr. Wallace's surveys do not accord with accepted survey principles regarding (1) selecting the proper survey universe, (2) ensuring a representative sample of the proper survey universe, (3) using clear, non-leading questions, (4) accurately reporting the data, and (5) analyzing the data according to accepted statistical principles. The Court considers each of these criticisms with a view towards whether Mr. Wallace's survey evidence should be excluded as unreliable.

### B. Survey Screening Questions and the Survey Universe

MiTek argues that the questions Mr. Wallace used to screen participants, and the "survey universe" that resulted from those questions, render Mr. Wallace's surveys unreliable. Dkt. No. 76 at 3-4, 11-12. To screen participants, Mr. Wallace used questions to select participants who: (1) have been employed in the construction industry for the last six months and plan to continue to be employed in the construction industry for the next six months; (2) are involved in the selection, specification, or purchase of structural connectors (such as hangers, angles, foundation anchors, and hurricane straps) used in the construction of wood-framed structures; and (3) hold one of the following job titles: architect, civil or structural engineer, professional engineer, construction design professional, design/build professional, purchasing/procurement agent for builder or developer, purchasing/procurement agent for construction professional, purchasing/procurement agent for lumber yard or construction product distributor, superintendent for builder or developer, or principal for builder or developer. Dkt. No. 84 ¶¶ 25-26. According to MiTek, the screening questions produced an over-inclusive survey universe because many respondents lacked the same familiarity with the structural connector industry that construction industry professionals would have. Dkt. No. 76 at 11; Dkt. No. 108 at 8. In addition, MiTek argues that the screening questions produced an under-inclusive survey universe because they improperly selected for only one segment of the potential purchasing public—industry professionals—but excluded do-it-yourself customers. Dkt. No. 76 at 11.

MiTek's objections go to the weight, not admissibility of the survey evidence. "The selection of an inappropriate universe generally affects the weight of the resulting survey data, not its admissibility." 6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*

§ 32:162 (5th ed. 2018). Even if a survey does not select the optimal universe, the results are often still probative of the proposition the survey was intended to test. *See Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 615 (9th Cir. 1989) (holding that an underinclusive survey's results were so strong that it still supported a finding of secondary meaning). For these reasons, courts within the Ninth Circuit are largely unwilling to exclude survey evidence on the basis of an over-inclusive or under-inclusive target population. *See Icon Enters. Int'l v. Am. Prods. Co.*, No. CV 04-1240, 2004 WL 5644805, at *25-26 (C.D. Cal. Oct. 7, 2004) (summarizing cases addressing improper survey universe).

Here, MiTek concedes that the relevant consuming public includes construction industry professionals, even if the relevant professionals may be more familiar with structural connectors than the survey universe. While MiTek may be correct that a *better* survey universe could have been selected to include a more refined set of construction industry professionals and to include relevant do-it-yourselfers, the Court is not persuaded that the survey evidence obtained has no probative value or is unreliable because of an imperfect universe of respondents surveyed.

### C. Survey Questions on Advertising Confusion and Secondary Meaning

MiTek argues that Mr. Wallace's surveys failed to use clear, non-leading questions and instead used suggestive, leading questions to test issues of confusion and secondary meaning, and that these errors render the survey evidence unreliable. Dkt. No. 76 at 14.

#### 1. Advertising confusion

In each of the four surveys, respondents were first presented with information about the stimulus, such as:

> "MiTek sells a structural connector called the ADTT-TZ. You are about to view a product label for MiTek's ADTT-TZ product. **Please base your answers to the following questions on the information on the label itself.** Please view this label as if you were considering purchasing or specifying this product for your current work."

Dkt. No. 84 ¶ 28 (emphasis in original).

//

//

//

6

1   Then respondents viewed an image of the stimulus, such as:



11  *Id.* Respondents were then asked as series of questions about their beliefs, such as:

- Based on this product label above, do you believe that MiTek's ADTT-TZ product is equivalent to the DTT1Z product?

- Based on this label, do you believe that MiTek's ADTT-TZ product has the same attributes, such as load capacity, number of required fasteners, and existence of code reports, as the DTT1Z product?

- Based on this label, do you believe that MiTek sells both the ADTT-TZ product and the DTT1Z product?

- Based on this label, do you believe that the company that sells the DTT1Z product endorses or approves of MiTek's reference to the DTT1Z product?

*Id.* ¶¶ 28-35.  These questions were followed by additional questions in the same instrument asking how respondents would behave if they learned certain additional information, such as:

- If you learned that the company that sells the DTT1Z does not endorse or approve of MiTek's reference to the DTT1Z product, would that cause you to specify or purchase the DTT1Z product instead of MiTek's ADTT-TZ?

- If you learned that the DTT1Z product is not sold by MiTek, would that cause you to specify or purchase the DTT1Z product instead of MiTek's ADTT-TZ?

- If you learned that MiTek's ADTT-TZ product has a load capacity of 820 lbs. for Douglas Fir/Southern Pine, while the DTT1Z product has a load capacity of 910 lbs., would that cause you to specify or purchase the DTT1Z product instead of MiTek's ADTT-TZ product?

7

- If you learned that MiTek's ADTT-TZ product requires 10 fasteners to achieve its load capacity while the DTT1Z requires 6 fasteners to achieve its load capacity, would that cause you to specify or purchase the DTT1Z product instead of MiTek's ADTT-TZ product?

*Id.* ¶¶ 36-42. For each question, the survey prompted respondents to answer "Yes," "No," or "Don't know." The response options were always provided in this order, with the "Yes" response always favorable to Simpson and unfavorable to MiTek. *See, e.g., id.* ¶ 29.

MiTek argues that these survey questions improperly suggested to respondents the substance of the information the survey was purporting to test. *See* Dkt. No. 76 at 9. For example, instead of using an open-ended question asking respondents what "Ref #: DTT1Z" means on the MiTek product label, the survey used a close-ended question (i.e. "do you believe that . . ."), suggesting to respondents (a) that DTT1Z refers to a product that belongs to a company other than MiTek and (b) that using "DTT1Z" as a reference means that MiTek is communicating its product is equivalent to the product of another company. In addition, MiTek points out that the order of presentation of the response options to these questions, with Simpson-favorable response options always presented first, biased the survey results in favor of those responses. Dkt. No. 76 at 9.

Simpson responds that no authority requires the use of open-ended questions or prohibits the use of close-ended questions. Dkt. No. 94 at 17. Simpson does not address MiTek's argument regarding a biased response order, but it says that the list of potential responses to these questions was exhaustive. *Id.* at 14. Simpson may be correct, but even the treatise on which Simpson relies cautions that when using closed-ended questions "care must be taken to ensure the response options used do not create bias." Dkt. No. 94 at 14 (Shari Seidman Diamond, *Trademark and Deceptive Advertising Surveys*, at 288). The treatise also addresses response option order: "To remedy response format effects, answers should generally be randomized or counterbalanced across respondents. . . . Both methods remove any impact from respondents who happen to choose options that are higher or lower on a list." Diamond at 288.

Simpson also argues that practical considerations informed Mr. Wallace's decision to use closed-ended questions with Yes/No/Don't Know responses in a consistent order. Simpson points

8

to *Vizcarra v. Unilever United States*, 339 F.R.D. 530 (N.D. Cal. 2021) as an example showing how such questions may be used appropriately to test an advertising claim.  In *Vizcarra*, the court considered and rejected objections to the questions posed in a survey designed to test an advertising claim about vanilla in ice cream for purposes of analyzing plaintiff's motion for class certification.  *Vizcarra*, however, is not particularly helpful.  In that case, the court did not consider the same kind of close-ended questions at issue here.  Rather, the analogous portion of the *Vizcarra* survey asked respondents a non-leading (or less leading) question about *what* their expectations were about a particular advertising claim, followed by multiple-choice response options that arguably covered all possible answers.  *Vizcarra*, 339 F.R.D. at 540.[3]  While the *Vizcarra* court declined to exclude the results of this survey for methodological errors, the court ultimately rejected the survey evidence because the survey did not test the advertising claim at issue and was therefore not relevant.  *Id.* at 542, 546.

      MiTek's arguments regarding the nature and format of Mr. Wallace's survey questions and the corresponding response-options are well-taken.  Many decisions have criticized similar survey instruments, even if those surveys were admitted and not excluded.  *See, e.g.*, *Valador, Inc. v. HTC Corp.*, 242 F.Supp.3d 448, 464-65 (E.D. Va. 2017) (survey excluded that included question: "How likely do you think it is that there will be confusion between the two products, the two product names, and the two VIVE names if they are used by different companies selling similar products?"); *LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, 661 F. Supp. 2d 940, 953-54 (N.D. Ill. 2009) (admitting survey that included some closed ended questions such as "Thinking of the commercial you just saw and what it said, showed, or implied about the advertised dryer, do you think the commercial . . . Could be for Dryer A only; Could be for Dryer B only; Could be for either Dryer A or Dryer B; Could not be for either Dryer A or Dryer B; or, don't you know?"); *Simon Prop. Grp. L.P. v. mySimon, Inc.*, 104 F.Supp.2d 1033, 1041 (S.D. Ind. 2000) (survey excluded for asking: "Do you believe that the two web pages just shown to you are put out by (a)

---

[3] The question was: "What is your expectation about whether all or not all of the vanilla flavor comes from vanilla extract (made from the vanilla plant)?"  The response options were: "not all of the vanilla flavor," "all of the vanilla flavor," and "not sure."  *Vizcarra*, 339 F.R.D. at 540.

Two unrelated sources, companies, or organizations; (b) The same source, company, or organization; (c) Related but different sources, companies, or organizations; or (d) Don't know?"). However, given the flexibility that survey professionals apparently believe is necessary in constructing a survey instrument intended to test for false or misleading advertising, the Court cannot say definitively that Mr. Wallace's use of these types of questions renders his surveys so unreliable as to permit or require exclusion under Ninth Circuit law. *See Fortune Dynamic*, 618 F.3d at 1037. Rather, MiTek's objections to the survey evidence are best considered as bearing on the weight the Court may afford this evidence at trial.

### 2. Secondary meaning

In each of the four surveys, questions about the stimulus were followed directly by questions regarding whether and to what extent respondents associate certain product names with Simpson or MiTek as a source of the product. In these questions, respondents were asked if they recognized certain Simpson product names, and if so, they were given space to write in which company or companies they associated with each product name. Dkt. No. 84 ¶¶ 92-96. For example, respondents were asked:

- Are you familiar with each of the following product names? [followed by "SSTB; IUS; MASA; RPBZ; URFP; VGT" in random order]
- What company or companies do you associate as making each of these products?

*Id.*

MiTek argues that these survey questions improperly conditioned respondents to associate Simpson product names with MiTek as a source because the questions immediately followed the sequence of questions designed to test for advertising confusion in which respondents repeatedly were shown stimuli including MiTek's brand name. Dkt. No. 108 at 7. According to MiTek, such questions should have been asked in a separate survey instrument so as not to bias the result. Dkt. No. 76 at 10-11.

Simpson responds that MiTek cites no authority requiring a separate survey. Dkt. No. 94 at 15. It argues that the survey results themselves suggest that Mr. Wallace's methodology was sound, as only 21 respondents out of 400 identified MiTek in response to the question regarding

10

the products' source. *Id.* at 15. However, as MiTek observes, these 21 respondents represent over 20% of the respondents who indicated *any* awareness of the product names at all, and only 53 respondents recognized Simpson as the source of its own products. Dkt. No. 108 at 7.

MiTek's arguments regarding the shortcomings in Mr. Wallace's secondary meaning surveys are persuasive. The structure of Mr. Wallace's surveys may well have biased respondents toward survey responses that were unfavorable to MiTek. But, as the Ninth Circuit instructs, MiTek's objections to "the format of the questions or the manner in which it was taken, bear on the weight of the evidence, not its admissibility." *Fortune Dynamic*, 618 F.3d at 1036 (9th Cir. 2010) (quoting *Keith v. Volpe*, 858 F.2d 467, 480 (9th Cir. 1988)).

### D. Control Surveys and Data Analysis

Mr. Wallace administered control versions of his four surveys to separate control group respondents. Where surveys attempt to link stimuli to a particular outcome, use of a control group can help factfinders interpret the results of the survey. *See Oracle Am., Inc. v. Google Inc.*, No. C 10-03561 WHA, 2016 WL 1743116, at *9 (N.D. Cal. May 2, 2016). If the control group and test group produce similar survey results, the outcome may have been caused by "noise," including things like preexisting views, guessing, and boredom. *See* 6 McCarthy on Trademarks and Unfair Competition § 32:187 (5th ed. 2018). "A control is necessary to identify this [noise]." *Id.*

In the advertising confusion portion of the surveys, the control group respondents were exposed to the same four MiTek stimuli but with the reference numbers removed. The respondents were asked the same questions. Dkt. No. 84 ¶ 99, 102-105. The surveys of the test groups and control groups produced similar results. In the secondary meaning portion of the surveys, the control group respondents were exposed to six fictitious product names instead of actual Simpson product names and were asked the same questions. Dkt. No. 84 ¶ 106. Here too, the surveys of the test groups and control groups produced similar results.

Interpreting his control survey results, Mr. Wallace suggests that the high levels of similarity may be "the result of MiTek's longstanding deceptive marketing practices that have created pre-conceived notions throughout the industry that the MiTek products and Reference Number (Simpson) products are equivalent." Dkt. No. 94 at 11; Dkt. No. 84 ¶ 117. In addition,

11

Mr. Wallace says, "these control respondents truly believe MiTek's deceptive messaging and . . . this deception is so widespread that it persists even when the Simpson product names are removed from MiTek's communications." *Id.* MiTek objects that Mr. Wallace's proposed testimony regarding the reasons for the similar control survey results is entirely speculative and unsupported, and should therefore be excluded. Simpson does not respond directly to MiTek's critique regarding Mr. Wallace's speculation, but argues that MiTek has not proposed an alternative control design, that it is within the discretion of the court to consider (or not consider) the results of control surveys, and that control surveys are not even required for the analysis Mr. Wallace performed.

The Court agrees that Mr. Wallace's proposed testimony, as reflected in paragraph 117 of his expert report, is unsupported and speculative. Mr. Wallace may testify regarding what the control survey results are and how they compare to the test survey results, including the statistical significance of any differences in the results (assuming his expert report discloses that analysis). However, Mr. Wallace may not speculate as to the reasons for either set of survey results, as his report discloses no basis for the explanations he provides. This evidence is excluded.

## IV. SIMPSON'S MOTION TO EXCLUDE FRANKLYN TESTIMONY

MiTek offers Professor Franklyn's testimony solely to rebut any evidence Mr. Wallace is permitted to offer at trial. Dkt. No. 115 at 103. Professor Franklyn did not conduct his own survey, but he offers several criticisms of Mr. Wallace's efforts, including: (1) Mr. Wallace used inappropriate survey methodologies designed to produce findings of confusion; (2) Mr. Wallace introduced bias into his secondary meaning survey; (3) Mr. Wallace used suggestive and leading questions; (4) Mr. Wallace disregarded his control survey results in interpreting his survey results; and (5) Mr. Wallace used an improper universe of survey participants. Dkt. No. 68-2 at 4.

Simpson moves to exclude Professor Franklyn's testimony on several grounds. First, Simpson argues that because Professor Franklyn conducted no survey of his own, his opinions are not based on any facts or data and must be excluded. Dkt. No. 67 at 4. Second, Simpson argues that Professor Franklyn's criticisms of Mr. Wallace's surveys are based on methodological concerns that apply only to trademark infringement claims and not false advertising claims, and

for this reason his opinions are unreliable. *Id.* at 9. Third, Simpson argues that because Professor Franklyn is not an expert in the construction connector industry, he should not be permitted to offer opinion testimony about those matters. *Id.* at 12.

MiTek responds that Professor Franklyn is well-qualified in survey methodologies and their review, and that the law in this Circuit allows for critiquing experts to offer opinions and testimony based on their knowledge and experience. Dkt. No. 102 at 4. MiTek further argues that Professor Franklyn's criticisms are valid because there is significant overlap between the principles in survey methodology of both trademarks and advertising confusion. *Id.* at 7. Finally, MiTek responds that Professor Franklyn is qualified to offer the opinions expressed in his report because his opinions concern survey methodology and not the construction connector industry itself. *Id.* at 8.

The Court finds that Professor Franklyn may testify to the full scope of his opinions regarding his critiques of Mr. Wallace's survey evidence. The objections Simpson raises to Professor Franklyn's report regarding Mr. Wallace's survey methodology, like MiTek's objections to Mr. Wallace's survey evidence, principally concern the weight afforded Professor Franklyn's testimony and evidence, not its admissibility. However, because Professor Franklyn does not have relevant expertise in the construction industry, certain aspects of his proposed testimony will be excluded or will be admitted contingent upon the record at trial.

Simpson specifically objects to several statements in Professor Franklyn's report and asks that the Court exclude these statements and any related testimony or opinions. Dkt. 67 at 13-14. Some of Simpson's objections are well-taken; others are not. *First,* some statements to which Simpson objects principally concern Professor Franklyn's criticisms of Mr. Wallace's survey methodology. These statements reflecting Professor Franklyn's analysis of Mr. Wallace's survey evidence are admissible for the reasons discussed above:

- I believe that, while he targeted the "most sophisticated" of potential purchasers, Mr. Wallace's survey results for this universe represents only a portion of the entire purchasing universe, and not the entirety of the buying populace, who are less likely to understand the nuances of Simpson's product naming convention and are also less sophisticated (if only because it's not their job).

13

- It is my impression that the roles that Mr. Wallace included within his screening criteria would be unlikely to purchase structural connectors through big box stores, and as such, he surveyed an underinclusive audience of buyers.

- However, even using this "most sophisticated" subset of respondents, responses to the sole open-ended questions exhibit unfamiliarity with the category, and in my opinion, are not representative of the sophisticated audience that Mr. Wallace outlines within his report.

- Conversely, Mr. Wallace's survey respondents exhibit limited to no understanding of the category.

- These open-ended responses show a generally unsophisticated buying group, with many respondents giving responses that make no sense and would commonly be screened out (alongside other data control) prior to doing final analysis.

- In doing so, he appears to willfully ignore the hundreds of responses that show a direct lack of knowledge of this industry, and the also sizable portion of respondents (about 40-50% of his underinclusive universe) who were unable to recognize some of the names of the most prominent Simpson products.

*Second,* some of Professor Franklyn's statements are assertions about the construction industry and structural connectors for which he lacks relevant expertise.  It is unclear whether Professor Franklyn is merely relying on facts supplied by others when he makes these assertions, because his report does not include citations to any such record evidence.  In any event, Professor Franklyn may testify to the following matters only if it is clear from the record that he is relying on information or evidence supplied by other competent sources:

- Based on my understanding of this category, the overlap of product naming conventions is common in this industry and has been for decades. Many companies use similar product names, as the naming conventions effectively become standard nomenclature due to their descriptiveness.

- Furthermore, there were, and currently are, a multitude of companies using similar naming conventions, including Silver Teco, Tamlyn, USP, ACS, and others.

- For example, there are multiple companies that make a wall brace and include "WB" within their naming conventions.

- It is my understanding that these products are directly available for consumer purchase at a variety of online and brick-and-mortar retailers, including Amazon, Home Depot, Menard's, and Lowes.

*//*

14

*Third,* some of Professor Franklyn's statements regard his beliefs about why MiTek chose particular naming or marketing strategies, or about how the relevant consuming public would react to alternative product names. Professor Franklyn is not competent to testify about these matters. He may not speculate about why MiTek made the decisions it made, nor may he speculate about the attitudes of the relevant consuming public, having not conducted his own survey research. Accordingly, Professor Franklyn may not testify to the following matters:

- Regarding MiTek's usage of the Simpson product names, I believe this to be due to the generic, descriptive, and functional naming conventions used by Simpson and for ease of construction professionals to find similar products.

- In my review of the totality of these product names, I find the overwhelming majority to be descriptive, and I believe that any alternative naming convention, that excludes these shorthands (e.g., FB for Fence Bracket), would make it significantly more difficult for construction professionals to find what they need.

## V.     CONCLUSION

For the foregoing reasons, the Court denies MiTek's motion to exclude the testimony of Simpson's expert Mr. Wallace, except the Court grants MiTek's motion to exclude Mr. Wallace's testimony regarding the reasons he believes the test surveys and control surveys produced similar results. The Court denies Simpson's motion to exclude the testimony of MiTek's expert Professor Franklyn, except the Court grants Simpson's motion with respect to certain matters, described above, that are outside the scope of Professor Franklyn's expertise.

**IT IS SO ORDERED.**

Dated: January 9, 2023

VIRGINIA K. DEMARCHI
United States Magistrate Judge

15