UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SIMPSON STRONG-TIE COMPANY INC., | Case No.  20-cv-06957-VKD |
| Plaintiff, | |
| v. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| MITEK INC., | |
| Defendant. | |

## I.    INTRODUCTION

In this action, plaintiff Simpson Strong-Tie Company Inc. ("Simpson") asserts the following claims against defendant Mitek Inc. ("MiTek"):

1.   false advertising under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B) (claim 1);

2.   false advertising under California Business & Professions Code § 17500 (claim 2);

3.   passing off under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) (claim 3);

4.   unfair competition under California Business & Professions Code § 17200 (claim 4); and

5.   copyright infringement under 17 U.S.C. § 106 (claim 5).

Dkt. No. 1; Dkt. No. 133 at 1.  Simpson seeks only injunctive relief against MiTek.  Dkt. No. 1 ¶ 86.  MiTek asserts several defenses and affirmative defenses, of which the following remained for trial:

1.   laches (as to claims 1, 2, 3, 4);

2.   statute of limitations (as to claims 1, 2, 3, 4);

3.   estoppel, waiver, or acquiescence (as to all claims);

United States District Court
Northern District of California

 4.  fair use (as to claims 1, 3, 5);

 5.  lack of inherent distinctiveness (as to claims 1, 3);

 6.  functionality (as to claims 1, 3, 5);

 7.  genericism (as to claims 1, 3);

 8.  copyright misuse (as to claim 5);

 9.  non-protectable product names (as to claim 5); and

 10. merger (as to claim 5).

Dkt. No. 133 at 2.[1]

The action was tried to the Court without a jury over nine days beginning on February 6, 2023.  Dkt. Nos. 153, 155, 158, 159, 160, 161, 162, 163, 165; Dkt. Nos. 179-191 (trial transcripts). The following witnesses testified live and/or by deposition:

 1.  Steven Brekke, MiTek's Senior Engineer/Product Scientist;

 2.  Kristi Campbell, MiTek's Executive Director of Corporate Accounts;

 3.  Roger Dankel, Simpson's Executive Vice President of North American Sales;

 4.  David Franklyn, MiTek's survey expert;

 5.  Todd Grevious, MiTek's Director of Engineering;

 6.  Sam Hensen, Simpson's Vice President and Branch Manager, Northwest Region, North America;

 7.  Douglas Hohbach, Simpson's structural engineering expert;

 8.  Mark Jensen, President, Advanced Connector Systems ("ACS");

 9.  Chris Mellott, President and General Counsel, Quick-Tie Products;

 10. Emory Montague, Simpson's Director of Engineering;

 11. Scott Morton, retired, formerly with P.H. Bowman Company;

 12. Keith Rabenberg, MiTek's former outside counsel;

 13. Stephen Rotzin, Simpson's Director of Legal Operations and Intellectual Property

---

[1] MiTek also asserts a defense of "failure to state a claim."  Dkt. No. 133 at 2.  However, the Court earlier concluded that Simpson did not fail to state a claim for relief as to the claims presented for trial.  *See* Dkt. No. 23.  The Court finds no reason to reconsider that decision and addresses all claims on the merits.

United States District Court
Northern District of California

1    Management;

2         14. Daniel Runde, Principal, Runde Engineering; and

3         15. Robert Wallace, Simpson's survey expert.

4         The parties filed proposed findings of fact and conclusions of law on March 9, 2023.  Dkt.

5    Nos. 170, 171.  Having considered the evidence presented, the Court now makes the following

6    findings of fact and conclusions of law pursuant to Rule 52(a)(1) of the Federal Rules of Civil

7    Procedure.

8         As explained in further detail below, the Court finds in favor of MiTek on Simpson's

9    claims of false advertising, passing off, unfair competition, and copyright infringement.

10   **II.    FINDINGS OF FACT**

11        **A.    The Parties**

12        1.    Simpson is a California corporation with its principal place of business in

13   Pleasanton, California.  Simpson designs, manufactures, and sells structural connectors, fasteners,

14   and other products for use in the construction industry.  Dkt. No. 125-1 ¶¶ 1, 2.

15        2.    MiTek is a Missouri corporation with its principal place of business in Chesterfield,

16   Missouri.  MiTek also designs, manufactures, and sells structural connectors and other products

17   for use in the construction industry.  Dkt. No. 125-1 ¶¶ 3, 5; Dkt. No. 168-17, Brekke dep. 11:12-

18   21.

19        3.    Simpson and MiTek are direct competitors with respect to providing structural

20   connectors for use in the construction industry.  Dkt. No. 125-1 ¶ 5.

21        **B.    Structural Connectors**

22        4.    Structural connectors are pre-engineered products used in the construction of wood-

23   framed and cold-formed steel-framed homes, commercial properties, and multi-unit residential

24   properties.  Dkt. No. 125-1 ¶ 8.

25        5.    Structural connectors are used to join, and transfer the load between, different

26   structural members, including vertical members like studs and posts, horizontal members like

27   floor joists and roof trusses, and foundations.  Dkt. No. 125-1 ¶ 9.

28        6.    "Load" may refer to the anticipated maximum weight of the structure, the

United States District Court
Northern District of California

3

United States District Court
Northern District of California

anticipated maximum weight of occupants and movable or stationary objects, and other external forces on the structure, such as soil, flood, earthquakes, wind, snow and ice.  Loads can be in one direction, multiple directions from a single source, or a combination of loads from various forces in multiple directions.  Dkt. No. 125-1 ¶ 10.

7.     Douglas Hohbach testified on behalf of Simpson as an expert in the field of structural engineering, including the specification of connectors for wood frame construction.  Tr. 199:25-200:3, 200:22-201:3.[2]  The Court finds his testimony persuasive and helpful and gives it significant weight.

8.     On a building construction project, the "engineer of record" is responsible for the structural design of the building, including ensuring that the structure complies with applicable building codes.  Tr. 198:20-199:2, 235:25-236:4.

9.     The engineer of record must indicate on the construction drawings the specific structural connectors that will be used on the project.  Tr. 233:15-234:2, 234:23-235:6.  The engineer may design a custom connector to join and transfer the load between members or he or she may specify a pre-engineered connector.  Dkt. No. 125-1 ¶ 11.  Virtually all modern wood-frame buildings use pre-engineered connectors.  Tr. 230:8-18.

10.    Generally, the two most important considerations for selecting a connector are geometry—i.e. whether the connector is configured to fit the particular application—and load capacity or strength—i.e. whether a connector is of adequate strength to resist the applicable load.  Tr. 231:3-14, 233:2-11, 237:21-238:10, 252:11-253:7.  Other considerations include aesthetics, treatment, and cost.  Tr. 231:15-232:12, 252:5-7.  For some customers, the cost of the connector is among the most important considerations.  Tr. 361:17-362:1, 362:7-16.

11.    Typically, the engineer of record specifies a connector noting both its part name and manufacturer (e.g. Simpson or MiTek) on the construction documents.  Tr. 233:25-234:22, 237:21-238:18, 253:8-17, 1026:22-25; *see also* Dkt. No. 168-2, Hohbach demonstrative, slide 8.

12.    The contractor, or a subcontractor, typically is responsible for purchasing the

---

[2] The Court refers to the trial transcript as "Tr."

4

structural connectors for a building construction project.  Tr. 204:24-205:3, 239:22-240:13.

13.     In the United States, Simpson's structural connectors are specified on most construction drawings.  Tr. 89:25-90:4; *see also* Tr. 54:21-23, 159:16-160:3 (discussing Simpson market share).

14.     MiTek encourages engineers to specify MiTek's own connectors instead of Simpson's in the first instance, or to specify both Simpson and MiTek connectors, a practice known as "dual specification."  Dkt. No. 168-17, Brekke dep. 41:19-42:20; Dkt. No. 168-19, Grevious Rule 30(b)(6) dep. 72:8-23; Tr. 1029:25-1030:16.

15.     If MiTek's connectors are not specified on the construction drawings, MiTek encourages the substitution of its connectors in place of the Simpson connectors that are specified. Dkt. No. 168-17, Brekke dep. 42:21-43:2; Dkt. No. 169-19, Grevious Rule 30(b)(6) dep. 72:8-13.

16.     The contractor on a building construction project is required to build all of the structural elements of the building to conform to the construction documents prepared by the engineer of record, including using the specified structural connectors.  Tr. 235:11-21.  The contractor may request that a different connector be used in place of the connector specified by the engineer, but may not use a different connector or otherwise deviate from the construction documents without the engineer's approval.  Dkt. No. 125-1 ¶ 12; Tr. 236:5-18, 241:23-242:22.

17.     Following an evaluation of a proposed substitute connector, the engineer of record may approve the substitution.  Tr. 241:10-22, 485:8-486:4.

18.     The engineer of record typically confirms that the specified connectors have been installed for a given building project.  Tr. 240:15-21.

19.     When a building inspector from the relevant jurisdiction inspects the building, the inspector typically confirms that the specified connectors have been installed as part of the inspection.  Tr. 240:25-241:3.

**C.     Simpson's Structural Connector Business**

20.     Simpson began selling structural connectors in 1956.  Tr. 54:17-22.

21.     Simpson invests substantial time and resources in educating architects, engineers, contractors, and others in the construction industry about Simpson's structural connectors and how

to use them.  Tr. 64:5-19, 132:19-133:12.

22.     Simpson currently is the overall market leader in the structural connector industry in North America.  Tr. 54:21-23.  Its market share for the North American market for structural connectors has exceeded 75 percent for the past several years.  Tr. 159:16-160:3, 378:9-19.

**D.     MiTek's Structural Connector Business**

23.     MiTek entered the structural connector market in 2011 when it acquired USP Structural Connectors ("USP") in 2011.  Dkt. No. 125-1 ¶ 6; Tr. 90:16-91:5, 467:23-468:2.

24.     MiTek traces its history back through USP to a company called TECO, founded in 1933, as well as to several other structural connector companies that USP acquired directly or indirectly over many years.  Ex. 109; Tr. 178:18-179:25, 363:1-19, 1210:13-1211:18.

25.     MiTek's predecessors include USP (which used the Kant-Sag and USP trade names), TECO, Lumberlok, TECO/Lumberlok, Silver Metal Products, Silver/TECO, Hughes Manufacturing, Covert Operations, Structural Soft, Renown Specialties Company ("RSC"), and Southeastern Metals ("SEMCO").  Ex. 109; Tr. 178:19-179:25, 1209:16-1211:18.

26.     In addition to providing structural connectors and other products for use in the construction industry, MiTek supplies construction-related software, services, and automated manufacturing equipment.  Dkt. No. 125-1 ¶ 4.

**E.     Product and Part Names for Structural Connectors**

27.     For decades, companies selling structural connectors have used product names comprised of words that describe the connector and/or the application in which the connector will be used.  These companies also have used part names that consist of an acronym formed from the initial letters of the words of the product name followed by a model number or stock number.  Ex. 2J; Ex. 2M; Ex. 4J; Ex. 5J; Ex. 7J; Ex. 8J; Ex. 246; Ex. 303: Tr. 382:12-384:11, 1211:20-1212:8.

28.     Simpson and MiTek use product names for their respective structural connectors. These product names are comprised of words that describe the connector and/or the application in which the connector will be used.  Tr. 75:17-21, 77:16-78:24, 81:17-19, 175:1-7 (Simpson); Tr. 1007:24-1009:17 (MiTek).

29.     Simpson and MiTek use product names for their respective structural connectors.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   The product names are formed from words that are common in the construction industry,

2   including:  hanger, anchor, clip, concrete, masonry, brick, post, column, cap, tie, strap, beam, base,

3   girder, rafter, roof, truss, hold down, plate, and retrofit.  Tr. 89:7-19, 97:9-15, 559:13-561:5.

4       30.     Simpson and MiTek also use part names for their respective structural connectors.

5   These part names generally consist of an acronym formed from the initial letters of the words that

6   describe the connector in the product name, followed by a model number or stock number that

7   corresponds to information about the particular connector, such as load capacity or size.  Tr.

8   75:22-76:2, 163:13-19, 175:1-4, 254:18-24, 1007:24-1009:10, 1211:24-1212:8.

9       31.     For example, Simpson has a connector called "truss barrier plate."  The product

10  name ("truss barrier plate") describes a connector plate that is installed on the bottom side of a

11  wood truss to create a barrier between the truss and a concrete or masonry wall to which it is then

12  attached.  The part name for a particular truss barrier plate begins with the acronym "TBP"

13  followed by a model number or stock number, such as "TBP8."  Ex. 26 at 248; Ex. 131; Tr. 79:6-

14  81:5.

15              **1.     Simpson's Product and Part Names**

16      32.     Simpson's product names are descriptive, in that they describe the connector and/or

17  the application in which the connector will be used.  Tr. 75:17-76:2, 77:16-78:4.

18      33.     Typically, Simpson selects new product names for its structural connectors from

19  among multiple options.  Tr. 52:6-53:9, 76:11-20, 80:18-81:5, 82:2-9.

20      34.     Simpson's naming process for its structural connectors is not dictated by a rule or

21  system, although Simpson may use similar words and/or letters for different connectors in the

22  same series.  The part name is limited by the number of characters that can be used—a maximum

23  of 16.  Tr. 87:12-88:2, 175:8-21.

24      35.     After Simpson chooses a product name and part name for a connector, it publishes

25  information in a "nomenclature guide" that explains the acronym in the part name.  Ex. 127; Tr.

26  88:3-89:5.

27      36.     Simpson offers approximately 1000 structural connectors, each with a product

28  name and corresponding part name.  Ex. 26; Ex. 161.

7

### 2. MiTek's Product and Part Names

37. MiTek's product names are descriptive, in that they describe the connector and/or the application in which the connector will be used.  Tr. 1007:24-1009:17.

38. When MiTek develops a connector to compete with an existing Simpson connector, MiTek often begins by assigning the MiTek connector in development the same name as the Simpson connector with which MiTek intends to compete.  Dkt. No. 168-17, Brekke dep. 85:6-86:2; Tr. 1083:14-20.  Sometimes MiTek retains this same name once development of the connector is completed and it is made available for sale.  Tr. 1010:10-16; Dkt. No. 168-17, Brekke dep. 70:13-71:16.

39. MiTek offers hundreds of structural connectors, each with a product name and corresponding part name.  Ex. 18; Ex. 119; Tr. 1015:21-22.

40. For 51 of MiTek's structural connectors, MiTek's part name is identical to the part name for the Simpson connector for the same application.  Ex. 321 at 1-2; Tr. 541:16-543:5.

41. For 32 of MiTek's structural connectors, MiTek's part name differs from the part name for the Simpson connector for the same application by one letter.  Ex. 321 at 3; Tr. 541:16-543:14.

### F. Product Catalogs and Other Sources of Information

42. Simpson and MiTek publish product catalogs that contain detailed information about their respective structural connectors.  Tr. 59:21-60:4, 481:5-15, 483:16-21, 593:3-6; *see also* Ex. 18; Ex. 26.

43. Engineers rely on the information in the parties' catalogs in evaluating whether a connector can be used in a particular application.  Tr. 257:23-258:5, 593:3-6, 1032:6-25.

44. Contractors may also consult the parties' respective catalogs, particularly if they intend to ask the engineer of record to approve a substitution of one connector for another.  Tr. 1058:6-1059:5.

### 1. Simpson

45. Every two years, Simpson publishes a catalog of its structural connector products.  Tr. 57:25-58:10.  The catalog includes the product names and part names for the connectors

United States District Court
Northern District of California

Simpson offers and provides technical information about Simpson's connectors for use by architects, engineers, contractors, and others in the construction industry.  Ex. 26; Ex. 161; Tr. 59:21-60:4.

46.     Detailed information about Simpson's structural connectors is also available in digital form on its website.  Tr. 102:15-103:8.

47.     Exhibit 161 is the Simpson 2017-2018 Wood Construction Connectors catalog. The catalog is 388 pages.  Ex. 161.  The catalog includes a two-page "alphabetical product index" or "API."  Ex. 161 at 4-5.

48.     The API is a list of the part names for the connectors included in the catalog with the page number where information about the connector can be found.  The part names are listed in alphabetical order.  Ex. 161 at 4-5; Tr. 668:6-669:4.

49.     The new products in the 2017-2018 catalog are identified in the API with an orange circular symbol and the word "new."  Ex. 161 at 4-5; Tr. 607:15-608:2.

50.     Simpson holds a registered copyright in the 2017-2018 catalog.  Ex. 163.

51.     Exhibit 26 is the Simpson 2019-2020 Wood Construction Connectors catalog.  The catalog is 340 pages.  Ex. 26.  The catalog includes a two-page API.  Ex. 26 at 4-5.

52.     The new products in the 2019-2020 catalog are identified in the API with an orange circular symbol and the word "new."  Ex. 26 at 4-5; Tr. 606:4-16.

53.     Simpson holds a registered copyright in the 2019-2020 catalog.  Ex. 160.

54.     All of the connectors that Simpson sells, and all of Simpson's catalogs, marketing literature, and retail display materials, are clearly labeled with the "Simpson Strong-Tie" name. Ex. 73; Ex. 97; Ex. 161; Ex. 164; Ex. 325; Ex. 326; Ex. 327; Ex. 401; Tr. 161:8-11.

**2.     MiTek**

55.     MiTek publishes a catalog that includes its structural connector products approximately every two years.  *See* Ex. 18; Ex. 119; Ex. 116; Ex. 115.  The catalog includes the product names and part names for the connectors MiTek offers and provides technical information about MiTek's structural connectors for use by architects, engineers, contractors, and others in the construction industry. Tr. 483:16-21, 1032:6-17; *see also* Ex. 18.

56.     Information about MiTek's structural connectors is also available in digital form on its website.  Ex. 329; Tr. 1032:6-25.

57.     Exhibit 18 is the MiTek Product Catalog, 60th edition.  It contains a reference number index.  Ex. 18 at 8-9.  The reference number index includes most of the part names listed in the API in Simpson's 2019-2020 Wood Construction Connectors catalog.  Tr. 650:5-651:6; *see also* Dkt. No. 168-4, Rotzin demonstrative, slide 4.

58.     Exhibit 119 is the MiTek Product Catalog, 59th edition.  The catalog contains a reference number index.  Ex. 119 at 8-9.  The reference number index includes most of the part names listed in the API in Simpson's 2017-2018 Wood Construction Connectors catalog.  Tr. 651:16-652:25; *see also* Dkt. No. 168-4, Rotzin demonstrative, slide 5.

59.     All of the connectors that MiTek sells, and all of MiTek's catalogs, marketing literature, and retail display materials, are clearly labeled with the "MiTek" name.  Ex. 10; Ex.18; Ex. 21; Ex. 24; Ex. 25; Ex. 119; Ex. 329; Tr. 1225:16-1226:13.

**G.     Industry Use of Reference Numbers**

60.     For decades, companies selling structural connectors have used "reference numbers" to cross-reference their competitors' products.  Ex. 8J at 26; Tr. 1214:8-1215:22; *see also* Ex. 235 at 60; Ex. 236 at 56; Ex. 238 at 2-3; Ex. 240 at 52; Ex 242 at 4-5; Ex. 243 at 44-54; Ex. 245 at 16; Ex. 289 at 3; Ex. 291 at 3; Ex. 292 at 4; Tr. 1304:7-21; Dkt. No. 173-10, Morton dep. 48:7-16.

61.     For the periods 1990-1991 and 1991-1992, USP published Kant-Sag-branded catalogs that included structural connectors.  Ex. 235; Ex. 236.  The Kant-Sag-branded catalogs included a "Part Number Conversion Chart" that listed Kant-Sag part names next to Simpson part names.  Ex. 235 at 60; Ex. 236 at 56; Tr. 367:4-7, 368:10-13.

62.     For the year 1992, Lumberlok published a catalog that included structural connectors.  Ex. 8J.  The Lumberlok catalog included a "Model No. Cross Reference" chart that listed Lumberlok part names next to the part names for Lumberlok's principal competitors, Panel Clip and Gang-Nail.  Ex. 8J at 26; Tr. 1213:14-1215:25.

63.     For the year 1994, KC Metals published a "Framing Accessories Cross Reference."

United States District Court
Northern District of California

Ex. 238.  The "Framing Accessories Cross Reference" listed KC Metals part names next to Simpson part names.  Ex. 238 at 2-3; Tr. 368:20-369:7.

64.     For the period 1997-1998, Hughes Manufacturing published a catalog that included structural connectors.  Ex. 240.  The Hughes catalog included a "Part Number Conversion Chart" that listed Hughes part names next to Simpson part names.  Ex. 240 at 52; Tr. 369:15-370:7.

65.     For the year 1998, TimberTie published a catalog that included structural connectors.  Ex. 242.  The TimberTie catalog included a "Reference Number Index" that listed TimberTie part names next to Simpson part names, without attributing the part names to Simpson.  Ex. 242 at 4-5; Tr. 370:12-371:24.

66.     For the year 2000, USP published a catalog that included structural connectors.  Ex. 106.  The USP catalog included a "Reference Number Index" that listed USP part names next to Simpson part names, without attributing the part names to Simpson.  Ex. 106 at 2; Tr. 1120:19-1121:24.

67.     For the year 2001, Advanced Connector Systems ("ACS") published a catalog that included structural connectors.  Ex. 243.  The ACS catalog included an "Index Comparison" that listed ACS part names next to Simpson part names.  Ex. 243 at 44-54; Tr. 372:4-21.

68.     For the year 2002, Tamlyn published a catalog that included structural connectors.  Ex. 245.  The Tamlyn catalog included a "Reference Guide" that listed Tamlyn part names next to Simpson part names and part names for other competitors.  Ex. 245 at 16.

69.     In 2010 and at other times, USP published a "National Comparison Guide."  Ex. 111; Tr. 327:3-328:11.  The guide includes indices of USP connectors and Simpson connectors, as well as charts that allow for side-by-side comparisons of USP's and Simpson's connectors.  Ex. 111; Tr. 327:3-328:11.

**H.     MiTek's Use of Simpson Part Names as Reference Numbers**

70.     MiTek uses reference numbers in its marketing materials.  These reference numbers are Simpson part names.  Dkt. No. 168-17, Brekke dep. 17:9-22.

71.     When MiTek uses reference numbers in its marketing materials, it does not affirmatively identify the reference numbers as Simpson part names.  Tr. 1329:13-15; *see also* Ex.

11

1    18; Ex. 21; Ex. 24; Ex. 119.



2    72.    After MiTek acquired USP in 2011, MiTek used Simpson part names as reference

numbers in MiTek's product catalogs, each of which includes a "Reference Number Index." Ex.

114 at 5; Ex. 115 at 6; Ex. 116 at 9-10; Ex. 119 at 8-9; Ex. 18 at 8-9.  The reference number index

in each catalog lists Simpson part names in alphabetical order, without attribution to Simpson, and

the page number where a MiTek connector product may be found.  *E.g.* Ex. 18 at 8.

73.    The 59th and 60th editions of MiTek's product catalogs include the following text

at the beginning of the reference number index:

> **About the Reference Numbers**
> Reference numbers shown through the charts in this catalog are part
> numbers which may be more familiar to customers in various
> regions of the United States.  These are included for the convenience
> of our new customers who have recently switched from a
> competitor's product line to [MiTek/USP].
>
> The reference numbers in this catalog are for general application
> comparison only and should not be used as a substitution tool.  The
> user is responsible to compare specific load values, fastener
> schedules, material specifications, and other factors to determine
> suitability of use for any particular product.

Ex. 18 at 8; Ex. 119 at 8.  Prior versions of the catalogs included the same or similar text.  Ex. 114

at 5; Ex. 115 at 6; Ex. 116 at 9.

74.    MiTek's catalogs also use Simpson part names as reference numbers, without

attribution to Simpson, in the tables that summarize the technical information for the MiTek

12

connector offered.  *E.g.* Ex. 18 at 73 (second column from left):



75.     MiTek also provides a Reference Number Conversion Guide.  Ex. 21.  The conversion guide lists Simpson part names in alphabetical order, without attribution to Simpson, next to MiTek part names.  Ex. 21.

76.     MiTek uses reference numbers in a similar fashion on its website, in its Specifier software, and in its mobile applications.  Ex. 329; Tr. 1329:5-1330:5, 1400:8-1401:10, 1403:6-17.

77.     MiTek also provides a Dealer Merchandising Guide that describes options for retailers to display MiTek products.  Ex. 25; Tr. 1222:16-1224:18.  The point-of-sale materials shown in the guide include product cards that use Simpson part names as reference numbers without attribution.  *E.g.* Ex. 25 at 4 (upper right corner after "Ref #"):

United States District Court
Northern District of California

13

78.     The point-of-sale materials shown in the guide also include a Reference Number Conversion Chart that is similar to the Reference Number Conversion Guide (Ex. 21) but is formatted for display at the end of an aisle in a retail store.  Ex. 25 at 5.

79.     MiTek uses reference numbers on labels that are placed on boxes or cartons of connectors.  *See* Ex. 24.

80.     Most MiTek connectors have at least one attribute that differs from the referenced Simpson connector.[3]  Ex. 312; Tr. 615:5-6.

81.     MiTek's use of reference numbers is susceptible to different meanings.  However, the Court finds that MiTek intends the reference number to identify the Simpson connector for which the MiTek connector possibly may be used instead, provided the necessary evaluation establishes that the connector is suitable for use in the particular application.  Ex. 329 at 5; Dkt. No. 168-17, Brekke dep. 17:9-22, 22:11-24:14, 27:2-29:6, 36:14-37:6; Tr. 1034:7-21.

82.     MiTek's use of reference numbers is consistent with how reference numbers have been used in the construction industry for decades, and in particular with how reference numbers have been used by providers of structural connectors.

**I.      Sales and Marketing of Structural Connectors**

        **1.      Simpson**

83.     Simpson sells structural connectors, directly or through a distributor, to

---

[3] Per the parties' stipulation, "attribute" means "any of the following aspects of a product: the allowable loads or capacities of the product, the number or type of fasteners required to achieve an allowable load or capacity for the product, the gauge of metal of the product, the existence of a patented feature of the product, the existence of a code report for the product, or the particular conditions or applications for which allowable loads and capacities have been published for the product."  Ex. 312 at 2.

"transactional customers." Tr. 277:1-6, 278:3-13. Transactional customers are lumber yards, hardware stores, pro dealers, big box retailers, and OEM component manufacturers. Tr. 276:21-277:6, 277:13-279:2.

84. Simpson markets its connectors to "specifier customers" and other "non-transactional customers." Specifier customers are individuals who are in a position to direct or approve the use of a connector in an application, such as an engineer or a building inspector. Tr. 276:21-277:12, 279:3-25. Other non-transactional customers include contractors and framers who are responsible for purchasing the products specified by the engineer. Tr. 280:1-281:2; *see also* Tr. 281:3-282:5.

85. Simpson relies on its catalog (print and digital versions) in marketing and selling its structural connectors. Tr. 285:5-19.

86. Professional contractors and framers purchase Simpson's structural connectors from Simpson's transactional customers, including from big box retailers like Lowe's and Home Depot. Tr. 239:16-240:3, 278:3-282:5, 293:12-24.

87. Overall, approximately 90 percent of Simpson's sales of structural connectors are to professional contractors and framers. Tr. 309:10-310:14.

88. Approximately 60 percent of the structural connectors Simpson sells through Lowe's are sold to professional contractors and framers, and approximately 80 percent of the structural connectors Simpson sells through Home Depot are sold to professional contractors and framers. Tr. 293:16-24, 354:5-22.

89. Non-professional, or do-it-yourself ("DIY"), customers purchase Simpson's structural connectors principally from retailers, including smaller hardware stores and big box stores like Lowe's and Home Depot. Tr. 282:6-284:4.

### 2. MiTek

90. MiTek markets its structural connector products to professional engineers, contractors, and framers. Dkt. No. 125-1 ¶¶ 5-12; Dkt. No. 168-17, Brekke dep. 41:19-43:2, 45:2-16; Tr. 1222:4-15.

91. MiTek relies on its catalog (print and digital versions) in marketing and selling its

structural connectors.  *See* Tr. 257:23-258:13, 1397:19-1398:18; Ex. 18; Ex. 119; Ex. 329.

92.     Professional contractors and framers purchase MiTek's structural connectors from lumber yards, hardware stores, pro dealers, and big box retailers.  Tr. 1033:4-12, 1234:8-1235:3.

93.     Non-professional DIY customers typically purchase MiTek's structural connectors from big box retailers like Menard's.  Tr. 1033:4-8.

94.     Retailers generally stock only one manufacturer's connector products, i.e., either Simpson products or MiTek products, but not both.  Tr. 287:24-288:6, 1237:13-15.

95.     On occasion, MiTek communicates with customers and prospective customers in the form of "equivalency letters."  Ex. 2; Ex. 3; Ex. 5; Ex. 6.  It is not clear from the record which, if any, letters MiTek sent to customers or prospective customers.  Simpson did not establish that any of the proposed or draft communications in Exhibits 2, 3, or 5 were sent to any customers or prospective customers.  Dkt. No. 168-19, Grevious Rule 30(b)(6) dep. 33:4-35:24, 36:2-14, 36:17-24, 37:1-23, 38:1-16 (discussing Ex. 2 and the use of letters generally); Dkt. No. 168-19, Grevious Rule 30(b)(6) dep. 41:1-42:18, 42:20-44:23 (describing Ex. 3 as including a "draft letter"); Dkt. No. 168-19, Grevious Rule 30(b)(6) dep. 47:8-48:8 (describing Ex. 5 as including "draft letters," all of which are unsigned).  Simpson did not establish that the letters in "different formats" attached to the cover email in Exhibit 6 were sent to any customers or prospective customers.  Ex. 6; Dkt. No. 168-19 Grevious Rule 30(b)(6) dep. 55:5-58:24, 59:2-7, 59:9-60:8, 60:16-60:25.  Two of the form letters in Exhibit 6 appear to be incomplete, as each refers to one or more attachments that are not part of the exhibit and were not otherwise admitted in evidence.  *See* Ex. 6 at 2, 5.

96.     The proposed, draft, and form "equivalency letters" differ in several respects, but they generally include representations that the "cross-reference" to Simpson connectors is provided to "assist" the customer in selecting the MiTek connector, or reflects MiTek's "recommendation," while advising that the "ultimate determination" regarding the suitability of a MiTek connector for a particular application is the responsibility of the engineer of record.  *See* Ex. 5 at 2; Ex. 6 at 5.

**J.     Confusion Evidence**

97.     Simpson offered no admissible evidence of actual confusion among members of the

16

relevant audience between Simpson and MiTek structural connectors caused by MiTek's use of reference numbers or by its use of particular part names. *See* Ex. 2; Ex. 3; Ex. 17; Tr. 107:20-111:5, 112:14-25 (sustaining hearsay objection), 772:16-22.

98.     Non-party witness Daniel Runde claimed to have knowledge of actual confusion between Simpson connectors and MiTek connectors, Dkt. No. 168-21, Runde dep. 37:14-43:4, but he could not provide any specific details regarding any instances of confusion or the cause of the purported confusion. *See* Dkt. No. 168-21, Runde dep. 74:7-77:9; *see also id.* 51:14-52:3, 54:2-55:10. Mr. Runde's opinion that there would be less confusion if MiTek did not use Simpson part numbers as reference numbers, Dkt. No. 16-21, Runde dep. 79:11-79:24, is not persuasive as it is not clear what basis, if any, Mr. Runde has for this opinion in view of his other testimony.

99.     Simpson offered no evidence that an engineer elected to specify or purchase a MiTek connector based on MiTek's use of a Simpson part number as a reference number because the engineer believed the reference number meant that the MiTek connector was equivalent to or substitutable for a Simpson connector.

100.     Simpson offered no evidence that any customer (professional or non-professional) purchased a MiTek connector based on MiTek's use of a Simpson part number as a reference number because the customer believed the reference number meant that the MiTek connector was equivalent to or substitutable for a Simpson connector. *See* Tr. 149:22-152:17, 154:4-25.

101.     MiTek has received inquiries about whether its connectors may be used for particular applications, including in place of Simpson's. *See* Ex. 53; Ex. 7; Ex. 226. However, there is no evidence that any inquiry arose from confusion or misunderstanding associated with MiTek's use of Simpson part names as reference numbers or MiTek's use of part names similar or identical to Simpson part names. *See* Ex. 53; Ex. 7; Ex. 226; Tr. 1065:12-1067:23, 1068:3-1069:17, 1071:6-1075:14.

102.     In 2013, a MiTek salesperson reported to other MiTek personnel that a customer expressed concern that a MiTek product was not a good substitute for the Simpson product referenced by MiTek, and the salesperson questioned MiTek's use of that reference number for the MiTek product. Ex. 61. However, there is no admissible evidence that the customer was

confused or misled by MiTek's use of the reference number.  Ex. 61; Tr. 1242:18-1246:20, 1250:5-1251:2; *see also* Tr. 1300:21-1302:3 (sustaining hearsay objection to portion of Ex. 61).

103.    In the approximately 40 years Simpson's expert Mr. Hohbach has been specifying products for building construction projects, he has rejected a substitution request on about 10 to 20 occasions.  Tr. 260:22-24, 263:24-264:3.

104.    In the approximately 40 years Mr. Hohbach has been specifying products for building construction projects, he recalls that there were fewer than 10 occasions where an unauthorized connector was installed, and of those, there were only three occasions where the unauthorized connector had to be removed or where an invasive retrofit was required.  Tr. 260:22-261:6, 270:10-25.  He was unable to identify which unauthorized connectors were installed on those three occasions or why they were installed without approval of the engineer of record.  Tr. 261:16-262:7.

**K.    Survey Evidence**

105.    Robert Wallace testified on Simpson's behalf as an expert in consumer surveys and brand communications.  Tr. 726:14-21.  Mr. Wallace conducted surveys for purposes of this litigation.  Tr. 728:19-729:7.

106.    Mr. Wallace's survey respondents did not include non-professional DIYers.  Tr. 807:22-809:5.

107.    According to Mr. Wallace, the survey results show:  (1) the relevant purchasing public believes that MiTek's use of reference numbers means that MiTek's connectors are equivalent to Simpson's connectors; (2) the relevant purchasing public believes that MiTek's use of reference numbers means that MiTek's connectors and Simpson's connectors are from the same source or are affiliated; (3) the relevant purchasing public believes that Simpson has authorized MiTek's use of reference numbers; and (4) Simpson sales have been diverted to MiTek as a result of MiTek's use of reference numbers.  Tr. 727:7-728:2.

108.    David Franklyn testified on MiTek's behalf as an expert in survey design and methodology.  Tr. 911:9-13.  Mr. Franklyn reviewed and critiqued Mr. Wallace's surveys and the conclusions Mr. Wallace drew from the survey results.  Tr. 911:22-24.

109.     According to Mr. Franklyn the Wallace surveys use an unsound and ill-suited methodology and therefore produce unreliable results which do not support Mr. Wallace's opinions. Tr. 912:13-914:15.

110.     For the reasons explained below in sections III.A.1 and III.B.1, the Court finds Mr. Wallace's survey evidence and opinions unpersuasive.

**L.     Simpson's Knowledge of Relevant Conduct and Decision Not to Sue**

111.     In September of 1988, an attorney for Simpson sent a letter to Silver Metal Products ("Silver Metal") complaining about a "Simpson to Silver Conversion Chart" which listed 39 Silver Metal connectors by part name next to the part names of "alleged equivalent" Simpson connectors. Ex. 100. That letter includes the following statement on Simpson's behalf: "We believe that the 'Conversion Chart' is a false description or representation that the Silver Connectors in the 'Conversion Chart' are equal or equivalent to the Simpson connectors and that customers of these products will be misled by this false representation." Ex. 100 at 1. The letter elaborates at length about the nature of the false representation. Ex. 100 at 2. The letter also asserts that Silver Metal is "liable under Section 43(a) (15 USCS 1125a) of the Federal Lanham Act" and warns that Simpson will initiate legal action if Silver Metal does not agree to cease all use of the conversion chart. Ex. 100 at 2, 3; Tr. 182:4-183:19.

112.     For the periods 1990-1991 and 1991-1992, USP published Kant-Sag-branded catalogs that included structural connectors. Ex. 235; Ex. 236. The Kant-Sag-branded catalogs included an alphabetical index of part names for USP's structural connectors. Ex. 235 at 3; Ex. 236 at 3; Tr. 366:18-367:3, 368:2-9. The catalogs also included a "Part Number Conversion Chart" that listed Kant-Sag part names next to Simpson part names. Ex. 235 at 60; Ex. 236 at 56; Tr. 367:4-7, 368:10-13. Simpson was aware of the Kant-Sag catalogs and the "Part Number Conversion Chart" at the time it was published. Tr. 366:18-368:19.

113.     For the year 1994, KC Metals published a "Framing Accessories Cross Reference." Ex. 238. The "Framing Accessories Cross Reference" listed KC Metals part names next to Simpson part names. Ex. 238 at 2-3; Tr. 368:20-369:7. The part names for some of the KC Metals connectors are identical to Simpson part names. Ex. 238 at 2-3; Tr. 369:8-10. Simpson

1    was aware of the KC Metals "Framing Accessories Cross Reference" at the time it was published.

2    Tr. 368:20-24.

3        114.    For the period 1997-1998, Hughes Manufacturing published a catalog that included

4    structural connectors.  Ex. 240.  The Hughes catalog included an alphabetical index of part names.

5    Ex. 240 at 6.  The Hughes catalog included a "Part Number Conversion Chart" that listed Hughes

6    part names next to Simpson part names.  Ex. 240 at 52; Tr. 370:2-7.  Simpson was aware of the

7    Hughes catalog and the "Part Number Conversion Chart" at the time it was published.  Tr. 369:15-

8    21, 370:5-7.

9        115.    In February of 1997, an attorney for Simpson sent a letter to USP.  Ex. 103.  The

10    letter complains about the use of part names similar to Simpson's part names on the ground that

11    such use infringes Simpson's trademark rights and will confuse the purchasing public as to the

12    origin of USP's connectors.  Ex. 103 at 2, 3.  The letter threatens "stronger action" if USP declines

13    to stop using the part names at issue.  Ex. 103 at 3; Tr. 186:6-188:4.

14        116.    For the year 1998, TimberTie published a catalog that included structural

15    connectors.  Ex. 242.  The TimberTie catalog included a reference number index that listed

16    Simpson part names without attributing the part names to Simpson.  Ex. 242 at 4-5; Tr. 371:14-24.

17    Simpson was aware of the TimberTie catalog and the reference number index at the time it was

18    published.  Tr. 370:12-18.

19        117.    For the year 2000, USP published a catalog that included structural connectors.  Ex.

20    106.  The USP catalog included a "Reference Number Index" that listed Simpson part numbers,

21    without attribution, accompanied by language stating "[t]he reference numbers in this catalog are

22    for general application comparison only and should not be used as a substitution tool."  Ex. 106 at

23    2; Tr. 1120:19-1121:24.  Simpson was aware of this USP catalog at the time it was published.

24        118.    For the year 2001, Advanced Connector Systems ("ACS") published a catalog that

25    included structural connectors.  Ex. 243.  The ACS catalog included an "Index Comparison" that

26    listed ACS part names next to Simpson part names.  Ex. 243 at 44-54; Tr. 372:12-21.  Simpson

27    was aware of the ACS catalog and the "Index Comparison" at the time it was published.  Tr.

28    372:4-24.

United States District Court
Northern District of California

119.    For the year 2002, Tamlyn published a catalog that included structural connectors. Ex. 245.  The Tamlyn catalog included a "Reference Guide" that listed Tamlyn part names next to Simpson part names and part names for other competitors.  Ex. 245 at 16.  The part names for some of the Tamlyn connectors are identical to Simpson part names.  Tr. 373:12-17.  Simpson was aware of the Tamlyn catalog and the "Reference Guide" at the time it was published.  Tr. 373:5-11.

120.    In 2010 and at other times, USP published a "National Comparison Guide."  Ex. 111; Tr. 327:3-328:11.  The guide included indices of USP connectors and Simpson connectors, as well as charts that allow for side-by-side comparisons of USP's and Simpson's connectors.  Ex. 111; Tr. 327:3-328:11.

121.    After MiTek acquired USP in 2011, Simpson observed that MiTek increased the frequency of its new product offerings.  Tr. 134:13-141:3, 318:3-15.

122.     After MiTek acquired USP in 2011, MiTek began using Simpson part names as reference numbers without attribution on MiTek's website, in a reference chart and elsewhere in the MiTek connectors catalog, in a separate reference conversion chart, and on point-of-sale materials in retail stores.  Tr. 134:13-141:3, 332:6-333:18; *compare* Ex. 111 at 3, 5 (referencing Simpson name and product information) *with* Ex. 25 (omitting Simpson name and product information).

123.    The MiTek product catalog published in 2013 included images showing bin cards for use in retail stores as well as an end aisle chart that included Simpson part names as reference numbers.  Ex. 115 at 9; Tr. 1125:11-1127:9.

124.    As of at least 2015, following the resolution of prior litigation between the parties, Simpson knew that MiTek had no plans to change its use of refence numbers.  Tr. 167:5-8, 168:10-12.

125.    Simpson's Mr. Hensen and Mr. Rotzin believed in August of 2017, as well as 12-18 months before that date, that grounds existed to sue MiTek for false advertising and/or passing off, but Simpson's management chose not to file a lawsuit at those times. Ex. 139; Tr. 168:17-170:5, 706:4-708:16.

126.     Simpson did not sue MiTek before October of 2020 because Simpson chose not to spend resources on litigation, and instead chose to invest in other activities to benefit its business. Tr. 141:4-142:24.

127.     It is not plausible that Simpson concluded in December 2013 that MiTek would change how it named its products or how it used reference numbers.  MiTek expressly rejected any such agreement to change when Simpson proposed it.  Ex. 78; Ex. 80; Tr. 632:19-635:16.  Mr. Rotzin's testimony that despite MiTek's express rejection of Simpson's proposed terms of settlement for the parties' prior litigation, MiTek separately represented it would nevertheless make these changes, is not credible.  Although there were many written and oral communications between the parties in and around December 2013, there is no corroboration of the representation Mr. Rotzin says MiTek made.  While corroboration is not required, Mr. Rotzin's testimony is inconsistent with other communications, other testimony, and MiTek's own conduct.  *See* Ex. 78; Ex. 80; Ex. 86; Tr. 636:11-639:16, 687:5-695:8, 698:24-706:3, 1183:21-1184:18, 1186:1-1188:25.

128.     During the 10 years prior to Simpson's filing of this action in 2020, several potential witnesses with knowledge of historical products and industry practices died.  *See* Tr. 1219:2-1222:3.  In addition, MiTek and its predecessors did not retain product catalogs and other documentation reflecting historical product names and part names that might have been retained had Simpson filed this action earlier.  Tr. 1215:1-1218:18; *see also* Ex. 61; Tr. 1257:8-22.

III.     **CONCLUSIONS OF LAW**

    A.     **Claims 1 and 2:  False Advertising**

Simpson challenges MiTek's use of Simpson part names as reference numbers in MiTek's catalogs, website, product packaging, software, mobile application, and point-of-sale materials as false advertising under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), and California Business & Professions Code § 17500.[4]  Dkt. No. 1 ¶¶ 35-43; Dkt. No. 133 at 1; *see also* Dkt. No. 170 at 16-

---

[4] Simpson treats its false advertising claim under California Business & Professions Code § 17500 as "substantially congruent" with its Lanham Act false advertising claim.  Dkt. No. 170 at 116.  The Court agrees with this approach.  The conclusions of law as to Simpson's Lanham Act false advertising claim apply equally to its state law claim.

30, 86.  Specifically, Simpson contends that MiTek's use of reference numbers falsely implies that MiTek's connectors are equivalent to Simpson's connectors for purposes of substitution.  Dkt. No. 170 at 84.

A false advertising claim under the Lanham Act requires proof of the following elements: (1) a false statement of fact by the defendant in commercial advertising or promotion about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to the defendant or by a lessening of the goodwill associated with its products.  15 U.S.C. § 1125(a)(1)(B); *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).

The parties do not dispute that MiTek's use of reference numbers are statements in commercial advertising or promotion and that the statements were made in interstate commerce.

Simpson bears the burden of proof by a preponderance of the evidence.

### 1.    False or misleading

"To demonstrate falsity within the meaning of the Lanham Act, a plaintiff may show that the statement was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse [the relevant audience]."  *Southland Sod Farms*, 108 F.3d at 1139 & n.2.  Simpson's principal contention is that MiTek's use of reference numbers necessarily implies a false claim of equivalence for purposes of substitution.  Dkt. No. 170 at 85.

The statements in question must be considered in the contexts in which they are presented. *Southland Sod*, 108 F.3d at 1139.  "A claim is conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated."  *Clorox Co. v. Proctor & Gamble Commer. Co.*, 228 F.3d 24, 35 (1st Cir. 2000); *see also Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 202 (3d Cir. 2014) ("Based on a facial analysis of the product name or advertising, the consumer will

23

1   unavoidably receive a false message.") (citation omitted); *Kwan Software Eng'g, Inc. v. Foray*

2   *Techs.*, LLC, 2014 WL 572290, at *5 (N.D. Cal. Feb. 11, 2014) ("[I]f the language or graphic is

3   susceptible to more than one reasonable interpretation, the advertisement cannot be literally

4   false.") (internal quotation omitted).

5        As required, the Court considers MiTek's use of reference numbers in the contexts in

6   which the use occurs—namely, MiTek's catalogs, website, product packaging, software, mobile

7   application, and point-of-sale materials.

8        The statements in question are not unambiguously false.  As the Court finds above, the

9   statements are reasonably susceptible to more than one meaning, including that the Simpson and

10  MiTek products are generally suited to the same application or function; that the relevant audience

11  should compare the MiTek product to the referenced Simpson product; or that the Simpson and

12  MiTek products are indeed substitutable for one another.  Thus, MiTek's use of reference numbers

13  does not necessarily imply that the MiTek connector with which a reference number is associated

14  is equivalent to and substitutable for the referenced Simpson connector.  In particular, Simpson

15  has not shown that MiTek's use of reference numbers implies that the MiTek connector may be

16  used automatically in place of the referenced Simpson connector without further evaluation.

17       The Court is not persuaded that MiTek's use of reference numbers conveys a meaning by

18  necessary implication when the reference numbers are used in MiTek's point-of-sale materials in a

19  retail environment that differs from the meaning conveyed when the reference numbers are used in

20  MiTek's catalogs, website, Specifier software, or mobile application.

21       Simpson has not met its burden to show that the statements in question are false by

22  necessary implication.

23       In the alternative, Simpson contends that even if MiTek's use of reference numbers does

24  not necessarily imply that MiTek's connectors are equivalent to Simpson's connectors for

25  purposes of substitution, MiTek's use of reference numbers intentionally misleads or is likely to

26  mislead the relevant audience.  Dkt. No. 170 at 102-106.  Simpson relies on essentially the same

27  evidence to support its claim that MiTek's use of reference numbers is misleading as it does to

28  support its claim that the use of reference numbers necessarily implies a false statement of

United States District Court
Northern District of California

equivalency for purposes of substitution.  *See id.*  For the reasons, explained above, the Court finds this evidence unpersuasive.

As the Court finds above, in all contexts, the reference number identifies the Simpson connector for which the MiTek connector possibly may be used instead, provided the necessary evaluation establishes that the MiTek connector is suitable for use in the particular application. Because Simpson's structural connectors are specified in the first instance on most construction drawings in the United States, the reference number serves as a starting point for identifying the relevant MiTek connector for further investigation for a possible substitution of the MiTek connector for the Simpson connector.  Even where Simpson structural connectors are not already specified on the construction drawings, because Simpson is by far the dominant provider of structural connectors throughout the United States and therefore familiar to designers and engineers, the reference number serves a similar purpose as a starting point for identifying the relevant MiTek connector for evaluation to be specified instead of or in addition to (as in the case of dual specification) the referenced Simpson connector.

Simpson relies on MiTek's purported use of equivalency letters addressed to particular customers or prospective customers that rely, at least in part, on "cross-references" to Simpson connectors using Simpson part numbers.  *Id.* at 102.  Because Simpson has not shown which of any such equivalency letters were actually sent to a customer or prospective customer, and has not established the contents of any such communication, it has not met its burden to show that the equivalency letters themselves contained misleading statements regarding MiTek's use of reference numbers.

The Court is not persuaded that MiTek's use of reference numbers is likely to mislead when the reference numbers are used in MiTek's point-of-sale materials in a retail environment rather than in its catalogs, website, Specifier software, or mobile application.

In assessing whether the statements in question are false by necessary implication or likely to mislead the relevant purchasing public, the Court considered MiTek's survey evidence and the testimony of its expert Mr. Wallace.  In particular, the Court considered Mr. Wallace's opinion that the relevant purchasing public believes that MiTek's use of reference numbers means that

1    MiTek's connectors are equivalent to Simpson's connectors.  The Court gives this opinion no

2    weight for three principal reasons.

3         First, the survey instruments Mr. Wallace used to test survey respondents' views of

4    MiTek's use of reference numbers suggested to respondents the substance of the information the

5    survey was purporting to test.  For example, instead of using an open-ended question asking

6    respondents what "Ref #: DTT1Z" means on the MiTek product label, the survey used a close-

7    ended question (i.e. "do you believe that . . ."), suggesting to respondents (a) that DTT1Z refers to

8    a product that belongs to a company other than MiTek and (b) that using "DTT1Z" as a reference

9    means that MiTek is communicating its product is equivalent to the product of another company.

10   Tr. 873:3-24, 922:1-13, 923:3-9.  Because the survey questions suggested the conclusion Mr.

11   Wallace purported to investigate, the results provide no meaningful evidence regarding how the

12   relevant audience understands MiTek's use of reference numbers.

13        Second, Mr. Wallace's control survey results indicate that his primary survey results are

14   not reliable.  The control group respondents were exposed to the same MiTek stimuli—*e.g.* a

15   product label—as the primary survey respondents except that the reference numbers were removed

16   from the control stimuli.  Tr. 942:22-943:21.  Both groups of respondents were then asked the

17   same questions, even though those questions did not make sense in the context of the control

18   stimuli.  Tr. 942:23-945:4.  For example, the control respondents were asked whether "based on

19   this label, do you believe that MiTek sells [a product number not included in the label.]"  Tr.

20   944:3-21.  At trial, MiTek's expert critiqued this question format, testifying that "there's no way

21   that [the respondents] could intelligently say yes.  How could they say yes when don't know

22   what's being compared?"  Tr. 945:16-18.  Even so, the results of the primary and control surveys

23   are very similar, suggesting that the primary survey results are not reliable indicators of how the

24   relevant audience understands MiTek's use of reference numbers.  Tr. 769:4-22, 942:4-946:25.

25        Third, Mr. Wallace purported to test whether survey respondents recognized the reference

26   numbers as Simpson part numbers, and expressed the opinion that at least some part numbers are

27   strongly identified with Simpson as the source.  Tr. 753:6-754:14.  However, that opinion is not

28   supported by the survey results.  Mr. Wallace tested only six part names for "distinctiveness" or

United States District Court
Northern District of California

26

United States District Court
Northern District of California

1  "secondary meaning," and the results do not indicate that respondents identify these particular part

2  names with Simpson, particularly when the primary results are compared with the control results.

3  Tr. 830:5-835:6.

4      The Court concludes that Simpson has not met its burden to show that the statements in

5  question are false by necessary implication, intentionally misleading, or likely to mislead the

6  relevant audience.

7                    **2.        Deception**

8      Where a statement is literally false or intentionally misleading, deception may be

9  presumed.  *William H. Morris Co. v. Grp. W, Inc.*, 66 F.3d 255, 258 (9th Cir. 1995); *see also Avid*

10  *Identification Sys. v. Schering-Plough Corp.*, 33 F. App'x 854, 856 (9th Cir. 2002) ("Because

11  these representations were literally false, the statements carry with them the presumption that

12  consumers relied on and were deceived by them.").  In the absence of such presumption, Simpson

13  must show that the statements in question deceived a significant portion of the relevant audience.

14  *Southland Sod*, 108 F.3d at 1140; *Johnson & Johnson * Merck Consumer Pharmaceuticals Co. v.*

15  *Smithkline Beecham Corp.*, 960 F.2d 294, 297-98 (2d Cir. 1992) (requiring plaintiff to

16  demonstrate that "a statistically significant part of the commercial audience holds the false belief

17  allegedly communicated by the challenged advertisement").

18      Because Simpson has not established that the statements in question are literally false or

19  intentionally misleading, deception cannot be presumed.  *See William H. Morris*, 66 F.3d at 258.

20      Simpson did not show that MiTek's use of reference numbers actually deceived any

21  customers or prospective customers, let alone a substantial segment of the relevant audience.

22  Specifically, Simpson did not show that any member of the relevant audience understands

23  MiTek's use of reference numbers as conveying the message that a MiTek connector is equivalent

24  to a referenced Simpson connector for purposes of substitution, such that the MiTek connector

25  may be used in place of the referenced Simpson connector without further evaluation.

26      Simpson also did not show that MiTek's use of reference numbers has a tendency to

27  deceive a substantial segment of the relevant audience.

28      In assessing whether the statements in question have a tendency to deceive the relevant

audience, the Court considered MiTek's survey evidence and the testimony of its expert Mr. Wallace. In particular, the Court considered Mr. Wallace's opinion that the relevant audience believes that MiTek's use of reference numbers means that MiTek's connectors are equivalent to Simpson's connectors. The Court gives this opinion no weight for the reasons stated above in section III.A.1.

The Court concludes that Simpson has not met its burden to show that the statements in question actually deceived or have the tendency to deceive a substantial segment of the relevant audience.

### 3.    Materiality

A false advertising claim must be material in that it is "likely to influence the purchasing decision" of consumers. *Southland Sod Farms*, 108 F.3d at 1139. Materiality may be proven through surveys that provide evidence of a statement's impact. *Id.* at 1040. Materiality can also be established by showing that "the defendants misrepresented an inherent quality or characteristic of the product." *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1250 (11th Cir. 2002) (citation omitted); *see, e.g.*, *In-N-Out Burgers v. Smashburger IP Holder LLC*, No. SACV 17-1474 (DFMx), 2019 WL 1431904, at *7 (C.D. Cal. Feb. 6, 2019) (finding an advertising claim material "because the amount of beef in a burger is an inherent quality or characteristic of a burger").

The evidence established that, with few exceptions, the engineer of record specifies the structural connectors to be used for a building construction project. While the engineer does not purchase the connectors, the contractor or subcontractor who does must purchase the connectors that are specified by the engineer in the construction documents. The contractor or subcontractor may not use or install a different connector or otherwise deviate from the construction documents without the engineer's approval.

Simpson did not show that engineers are influenced to any degree by MiTek's use of Simpson part numbers as reference numbers. Rather, the evidence established that engineers decide which connector or connectors to specify based upon considerations of geometry, load capacity or strength, and, to a lesser extent, aesthetics, treatment, and cost, and that contractors and

1 | subcontractors purchase what the engineers specify or approve.

2 |     Simpson offered no evidence suggesting whether or to what extent MiTek's use of

3 | Simpson part numbers as reference numbers on point-of-sale materials influences the purchasing

4 | decisions of non-professional DIYers.

5 |     The Court concludes that Simpson has not met its burden to show that the statements in

6 | question are material, such that they are likely to influence, directly or indirectly, the purchasing

7 | decisions of the relevant audience.

8 | **4.    Injury**

9 |     Simpson seeks only an injunction against MiTek's use of reference numbers.  Where the

10 | plaintiff is a competitor suing another competitor for an injunction to prevent false advertising

11 | under the Lanham Act, the plaintiff need not prove actual injury.  *Harper House, Inc. v. Thomas*

12 | *Nelson, Inc.*, 889 F.2d 197, 210 (9th Cir. 1989); *Southland Sod Farms*, 108 F.3d at 1145-46.

13 |     Nevertheless, Simpson offered the opinion of its survey expert, Mr. Wallace, that Simpson

14 | sales have been diverted to MiTek as a result of MiTek's use of reference numbers.  Tr. 727:24-

15 | 728:2, 758:5-767:16.  The Court gives this opinion no weight.  As explained above in section

16 | III.A.1, Mr. Wallace's survey used a flawed methodology and his results are unreliable.  In

17 | particular, no survey result supports Mr. Wallace's conclusion that MiTek's use of reference

18 | numbers caused sales to be diverted from Simpson to MiTek because the relevant audience

19 | believed that MiTek's connectors are equivalent to Simpson's connectors for purposes of

20 | substitution.

21 |     Simpson offered no evidence of lost or diverted sales, or any other evidence of actual

22 | injury.

23 |     The Court concludes that Simpson has not shown that it is entitled to a presumption of

24 | injury or that it suffered or will suffer injury as a result of MiTek's use of the statements in

25 | question.

26 | **B.    Claim 3:  Passing Off**

27 |     Simpson challenges MiTek's use of part names for its products that are identical or similar

28 | to the part names for Simpson's products.  Simpson contends that in adopting Simpson part names

United States District Court
Northern District of California

29

as its own, MiTek is passing off its products as Simpson's in violation of the Lanham Act, 15

U.S.C. § 1125(a)(1)(A).  *See generally Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572

U.S. 118, 122 (2014) (distinguishing between "false association" and "false advertising" claims);

*Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 28-31 (2003) (describing nature

of passing off or false designation of origin claim).

To establish a claim for passing off or false designation of origin under the Lanham Act, a

plaintiff must show that the defendant (1) used in commerce (2) any word, false designation of

origin, false or misleading description, or representation of fact, which (3) is likely to cause

confusion or mistake, or to deceive, as to sponsorship, affiliation, or origin of the goods or

services in question.  *Luxul Tech. Inc. v. Nectarlux, LLC*, 78 F. Supp. 3d 1156, 1170 (N.D. Cal.

2015) (citing *Freecycle Network, Inc. v. Oey*, 505 F.3d 898, 902-04 (9th Cir. 2007); *Int'l Order of

Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 917 (9th Cir. 1980)).  Passing off may be

either express or implied.  *Lamothe v. Atl. Recording Corp.*, 847 F.2d 1403, 1406 (9th Cir. 1988).

While Simpson generally contends that all of its part names serve a source-identifying

function, at the close of the evidence it focused on the following specific part names that it says

MiTek has adopted for its own competing connectors, resulting in confusion as to the source or

affiliation of MiTek's connectors:

| MiTek Part Name | Simpson Part Name |
|-----------------|-------------------|
| BCS | BCS |
| ADTT | DTT |
| KEGQ | EGQ |
| EPBH | EPB |
| FWAN | FWAN |
| HGU | HGU |
| HGUM | HGUM |
| HHTA | HHETA |
| HRS | HRS |
| HTP | HTP |

| LGU | LGU |
| LGUM | LGUM |
| MGU | MGU |
| ML | ML |
| MUS | MUS |
| RPB | RPB |
| RST | RST |
| TSP | TSP |

The parties do not dispute that MiTek's part names are used in interstate commerce. Simpson bears the burden of proof by a preponderance of the evidence.

### 1.    Source identifying

As a threshold matter, Simpson must show that the part names at issue serve a source-identifying function. *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1041 (9th Cir. 2010). Simpson contends that its part names serve to identify Simpson as the source of the connector, while MiTek contends that Simpson's part names are descriptive or generic and cannot support a claim for passing off without Simpson first establishing that the names have acquired secondary meaning. *See Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1047 (9th Cir. 1998).

Simpson concedes that while it may devote effort and creativity to naming each new connector it releases, the name it selects is intended to describe the connector or its function, and the part name typically is an acronym formed from the initial letters of the product name followed by a model number or stock number. *See* Dkt. No. 170 at 4. Simpson has not shown that its product names are inherently distinctive; they are descriptive or, in some cases, generic. So too are the corresponding part names, including specifically the 18 part names listed above. For this reason, Simpson must show that the part names have acquired secondary meaning—i.e. that the relevant audience associates the part name with Simpson. *See Kendall-Jackson Winery*, 150 F.3d at 1047; *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 210-11 (2000) ("general principles" of trademark infringement apply to claims under 15 U.S.C. § 1125(a)(1)(A)).

The Court is not persuaded that the part names themselves serve a source-identifying

1   function.  As noted above, the relevant audience typically does not encounter Simpson's part

2   names alone.  Rather, the part names appear with the "Simpson" name and/or the registered

3   trademark STRONG-TIE in catalogs, on the Simpson website, and in other sales and marketing

4   materials.  Indeed, the evidence shows that engineers specify connectors *by manufacturer* (i.e.

5   Simpson or MiTek or both) in addition to including specific part names on construction drawing.

6   To the extent Simpson relies on the survey evidence and opinions of its expert Mr. Wallace, the

7   Court finds this evidence unpersuasive.  Mr. Wallace tested only six Simpson part names (SSTB,

8   IUS, MASA, RPBZ, URFP, VGT) for "distinctiveness" or secondary meaning, and none of these

9   six part names are among the eighteen names on which Simpson focuses its argument.  Tr. 730:1-

10  6, 753:6-18, 812:5-11, 827:16-23, 828:3-5, 832:9-833:12.  Moreover, the results of Mr. Wallace's

11  survey suggest that these six part names *do not* identify Simpson as the source, particularly when

12  one considers the survey control evidence.  *See* Tr. 830:5-833:12.

13      The Court concludes that Simpson has not met its burden to show that any of its part

14  names, including specifically the 18 part names listed above, serve a source-identifying function.

15  *See OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc*., 897 F.3d 1008, 1017 (9th Cir. 2018)

16  (quoting *Bretford Mfg., Inc. v. Smith Sys. Mfg. Corp*., 419 F.3d 576, 581 (7th Cir. 2005)) ("The

17  right question. . . is whether the consumer knows who has produced the finished product."); *see*

18  *also Blinded Veterans Ass'n v. Blinded Am. Veterans Found.*, 872 F.2d 1035, 1046 (D.C. Cir.

19  1989) ("What is essential . . . is evidence that people associate 'blinded veterans' with BVA per

20  se.").

21              **2.       Likelihood of confusion**

22      To show likelihood of confusion, Simpson must demonstrate that the relevant audience is

23  likely to be confused as to the origin of the connectors bearing the part names at issue.  *See*

24  *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1209 (9th Cir. 2012).  "To succeed, a plaintiff

25  must show more than simply a possibility of such confusion."  *Id.* (citing *Rodeo Collection, Ltd. v.*

26  *W. Seventh*, 812 F.2d 1215, 1217 (9th Cir. 1987), *abrogated on other grounds by eBay Inc. v.*

27  *MercExchange, LLC*, 547 U.S. 388, 393 (2006).  Evidence of actual confusion is not required.

28  *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1151 (9th Cir. 2011).

United States District Court
Northern District of California

In *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 (9th Cir. 1979), the Ninth Circuit set forth eight factors that are relevant to the likelihood of confusion analysis: (1) strength of the plaintiff's name or mark; (2) relatedness of the goods; (3) similarity of the name or mark; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) defendant's intent in selecting the name or mark; (8) likelihood of expansion of the product lines. *Id.* "It is well established that this multi-factor approach must be applied in a flexible fashion. The *Sleekcraft* factors are intended to function as a proxy or substitute for consumer confusion, not a rote checklist." *Rearden LLC*, 683 F.3d at 1209 (citing *Network Automation*, 638 F.3d at 1145). "A determination may rest on only those factors that are most pertinent to the particular case before the court, and other variables besides the enumerated factors should also be taken into account based on the particular circumstances." *Id.*; *see also Network Automation*, 638 F.3d at 1142, 1145, 1148-49, 1153-54; *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 631 (9th Cir. 2005).

While many of the *Sleekcraft* factors favor Simpson—e.g. the parties' connectors are closely related, in some cases the part names are the same, and the parties market their connectors in the same or similar channels—the other factors do not. In particular, as the Court has already concluded, Simpson's part names do not serve a source-identifying function, and the product and part names themselves are descriptive. Importantly, MiTek, like Simpson, uses its product and part names with its own "MiTek" name and trademark. Simpson's evidence of purported instances of actual confusion is limited at best, as it is comprised of anecdotal testimony untethered to any particular part name or specific instance of confusion. *See* Dkt. No. 170 at 71-72 (summarizing evidence). The engineers who specify connectors for construction projects are highly sophisticated, and while contractors and subcontractors may be less sophisticated, they nevertheless exercise a relatively high degree of care in selecting and purchasing the connectors specified. On the other hand, DIYers are likely to use a lesser degree of care. While MiTek has adopted some product names and the corresponding part names that are identical to those first

1    used by Simpson, the Court is not persuaded that MiTek did so with the intent to confuse the

2    relevant audience, but rather because the names described well the connector at issue.[5]

3        To the extent Simpson relies on Mr. Wallace's survey evidence or his opinion testimony,

4    the Court finds this evidence unpersuasive for the reasons explained above in sections III.A.1 and

5    III.B.1.

6        The Court concludes that Simpson has not met its burden to show that MiTek's use of

7    identical or similar part names is likely to cause confusion with respect to the manufacturer of the

8    connectors in question.

9        **C.    Claim 4:  Unfair Competition under California Law**

10       California's Unfair Competition Law ("UCL") prohibits "any [1] unlawful, [2] unfair or

11   fraudulent business act or practice and [3] unfair, deceptive, untrue or misleading advertising."

12   Cal. Bus. & Prof. Code § 17200.  Each prong is separately actionable, and a plaintiff need only

13   establish one of the prongs.  *Daro v. Super. Ct.*, 151 Cal. App. 4th 1079, 1093 (2007) ("[A]

14   business act or practice need only meet one of the three criteria—unlawful, unfair, or fraudulent—

15   to be considered unfair competition under the UCL.").  Moreover, a claim under the UCL is

16   substantially congruent to claims made under the Lanham Act and California's False Advertising

17   Law.  *CytoSport, Inc. v. Vital Pharms., Inc.*, 894 F. Supp. 2d 1285, 1295 (E.D. Cal. 2012); *Kasky

18   v. Nike, Inc.*, 27 Cal. 4th 939, 950 (2002); *see also* Dkt. No. 43 at 10-11.

19       Because Simpson has failed to prove either its false advertising or passing off claims, the

20   Court concludes that Simpson has also failed to prove its claim under the UCL.

21

22

23

24   _____

     [5] This case does not present the question of whether MiTek is likely to expand its product line into
25   a different product line offered by Simpson, as the part names in question concern structural
     connectors—a product line both parties already offer.  However, with respect to particular
26   connectors, the evidence is undisputed that Simpson typically is the first to introduce a particular
     connector to the marketplace and that MiTek then strives to offer a connector that can compete
27   with Simpson's offering.  *See* Tr. 91:16-20, 93:15-21, 995:7-23, 1004:20-23.  It is also undisputed
     that Simpson offers several connectors for which MiTek has not yet introduced a competing
28   connector.  *See* Tr. 992:8-18, 995:7-996:17.

United States District Court
Northern District of California

United States District Court
Northern District of California

### D.     Claim 5:  Copyright Infringement

Simpson holds valid, registered copyrights in two asserted works: the 2017-2018 Wood Construction Connectors Catalog and the 2019-2020 Wood Construct Connectors Catalog.  *See* Ex. 162; Ex. 163.  Simpson contends that MiTek copied the API found in each of the 2017-2018 and 2019-2020 catalogs.  Dkt. No. 170 at 123; Tr. 646:9-647:8; 649:7-14.  MiTek responds that the alleged copying is de minimis and therefore not actionable, and in addition, it asserts several affirmative defenses, including: non-protectable product names, merger, functionality, fair use, and copyright misuse.

A copyright holder has the exclusive rights to reproduce, distribute, publicly display, perform, and create derivative works of the copyrighted work.  17 U.S.C. § 106.  "A plaintiff bringing a claim for copyright infringement must demonstrate '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'"  *Funky Films, Inc. v. Time Warner Entm't Co.*, L.P., 462 F.3d 1072, 1076 (9th Cir. 2006) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)), *overruled on other grounds by Skidmore v. Led Zeppelin*, 952 F.3d 1051, 1069 (9th Cir. 2020).  Copying can be established by (1) evidence of direct copying or (2) a "fact-based showing[] that the defendant had access to the plaintiff's work and that the two works are substantially similar."  *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 481 (9th Cir. 2000) (internal quotations omitted), *overruled on other grounds by Skidmore*, 952 F.3d at 1069.

### 1.     Originality of the asserted works

The asserted works are derivative works.  Thus, Simpson's copyright protection covers only additions, changes, or new material in Simpson's 2017-2018 and 2019-2020 catalogs, but does not extend to material in prior versions of the catalogs.[6]  *See* 17 U.S.C. § 103(b).  As noted above, each catalog is over 300 pages and contains a two-page API, which lists in alphabetical

---

[6] Simpson owns copyright registrations for prior versions of the Wood Construction Connectors Catalog.  Tr. 648:13-22.

order the part names for the connectors included in the catalog with the page number where information about the connector can be found.

"To qualify for copyright protection, a work must be original to the author.  Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity."  *Feist*, 499 U.S. at 345 (citations omitted).  "To be sure, the requisite level of creativity is extremely low; even a slight amount will suffice.  The vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude, humble or obvious' it might be."  *Id.* (quoting 1 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 1.08(C)(1) (1990)).

Under the merger doctrine, courts will not protect a copyrighted work from infringement if the idea underlying the copyrighted work can be expressed in only one way, lest there be a monopoly on the underlying idea.  *Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1082 (9th Cir. 2000); *see also ATC Distribution Grp., Inc. v. Whatever It Takes Transmissions & Parts, Inc.*, 402 F.3d 700, 709 (6th Cir. 2005).  As a general matter, product names or abbreviations that are standard or prevalent in an industry are not protectable.  *See Sinai v. Bureau of Auto. Repair*, No. C-92-0274-VRW, 1992 WL 470699, at *2 (N.D. Cal. Dec. 21, 1992).  However, in some circumstances, alphanumeric codes or part numbers may be sufficiently original to qualify for copyright protection.  *See Am. Dental Ass'n v. Delta Dental Plans Ass'n*, 126 F.3d 977, 979-81 (7th Cir. 1997) (classification or naming schemes may be sufficiently creative to satisfy the originality requirement of copyright protection); *see also Toro Co. v. R & R Prods. Co.*, 787 F.2d 1208, 1213, 1215 (8th Cir. 1986) (holding that although the list of parts numbers at issue was "not copyrightable because it lack[ed] originality[,] . . . [a] system that uses symbols in some sort of meaningful pattern, something by which one could distinguish effort or content, would be an original work.").

Simpson concedes that arranging part names in alphabetical order in an index is not original or protectable, but it argues that the product names for the connectors and their corresponding part names reflect at least the minimal degree of creativity required for copyright

36

1    protection, and that the part names constitute protectable elements of the API.  *See* Dkt. No. 170 at

2    123-25.  MiTek contends that the API does not contain any protectable original expression

3    because the part names themselves are mere abbreviations of common industry terms and do not

4    contain the necessary minimal creativity, and the API merely lists the part names in alphabetical

5    order.  *See* Dkt. No. 171 ¶¶ 161-168.

6        Some of Simpson's part names appear to lack even minimal creativity, *see, e.g.*, Ex. 26 at

7    4, 246 ("H" for "Hurricane Ties"), but most of the others have the minimal level of creativity

8    required for copyright protection, *see, e.g.*, Ex. 26 at 4, 283 ("HSLQ" for "Heavy Shear Transfer

9    Angle").  While all of Simpson's product names and part names are descriptive—i.e. they describe

10   the function or application for which the connector may be used—with some exceptions, MiTek

11   has not shown that there are so few ways of naming the connectors at issue that the part name

12   merges with the idea of the connector itself or is otherwise unprotectable, particularly where the

13   part name has four or five letters.

14       The API in Simpson's 2017-2018 catalog contains at most 20 "new" part names—i.e. part

15   names that were not also included in the prior version of the catalog.  Ex. 161 at 4-5 ("new"

16   indicator); Tr. 672:7-674:22.  The API in Simpson's 2019-2020 catalog contains at most 14 "new"

17   part names.  Ex. 26 at 4-5 ("new" indicator); Tr. 675:12-677:7.  As Simpson concedes,

18   arrangement of the part names in alphabetical order in the API is not protected.

19                    **2.    Copying of protectable elements of the asserted works**

20       MiTek does not dispute that it copied portions of Simpson's APIs in the reference number

21   indices that appear in the 59th and 60th editions of MiTek's Product Catalogs.  *See* Ex. 119 at 8-9;

22   Ex. 18 at 8-9.  MiTek also does not dispute that it copied portions of Simpson's APIs in MiTek's

23   2018 Reference Number Conversion Guide.  *See* Ex. 21.  But even if the Court assumes that *all* of

24   the product names in the APIs at issue qualify for copyright protection, MiTek's copying of

25   protectable material when viewed in comparison to the asserted works as a whole is de minimis.

26       Simpson does not contend that MiTek copied its catalogs as a whole, such that MiTek's

27   catalogs and Reference Number Conversion Guide are substantially similar to Simpson's catalogs.

28   Rather, as explained above, Simpson contends that MiTek copied only the protected portions of

1   the APIs in Simpson's 2017-2018 and 2019-2020 catalogs.  The alleged copying is limited to the

2   new material—i.e. no more than 20 part names—in each API.

3         During trial, Simpson did not specifically identify for the Court which new part names

4   appeared in which of MiTek's accused works.  Instead, Simpson attempted to show that most of

5   the part names in each of Simpson's APIs appeared in MiTek's accused catalogs and Reference

6   Number Guide, without distinguishing the protectable new material in each Simpson catalog from

7   the unprotectable material.  However, the Court compared the Simpson and MiTek materials in

8   evidence and, so far as the Court can tell, MiTek's catalogs and Reference Number Guide

9   collectively include no more than 12 of the new Simpson part names.  *Compare* Ex. 161 and Ex.

10   26, *with* Ex. 119, Ex. 18, and Ex. 21.

11         Copying is de minimis and therefore not actionable where the amount of the copying is so

12   insubstantial in terms of quality or quantity that the accused work cannot be considered

13   substantially similar to the asserted work.  *See Bell v. Wilmott Storage Servs., LLC*, 12 F.4th 1065,

14   1075 (9th Cir. 2021).  Here, the quantity of copying is indeed minimal:  12 part names in a list of

15   approximately 400 part names, arranged in alphabetical order, in an over 300-page catalog.  The

16   quality of the material copied is also minimal.  The part names themselves are not source-

17   identifying and the indices of part names are essentially functional; they serve to identify the page

18   where a detailed description of the product corresponding to the part name may be found.  And

19   while Simpson is correct that product catalogs generally enjoy copyright protection, that

20   protection is rather limited.  As the Ninth Circuit has observed:

21   > The works at issue here contain a great many unprotectible facts and
22   > very little protectible expression of arrangement of those facts. This
   > is not altogether surprising. Catalogs, by definition, are saturated
23   > with facts, numbers, and literal depictions of concrete objects. As we
   > emphasized in an only slightly different context, copyright law
24   > considers factual works to be fundamentally different from more
   > artistic works: "similarity of expression may have to amount to
25   > verbatim reproduction or very close paraphrasing before a factual
   > work will be deemed infringed."

26   *Cooling Sys. & Flexibles, Inc. v. Stuart Radiator, Inc.*, 777 F.2d 485, 491 (9th Cir. 1985) (quoting

27   *Landsberg v. Scrabble Crossword Game Players, Inc.*, 736 F.2d 485, 488 (9th Cir. 1984)),

28   *overruled on other grounds by Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 959 F.3d 1194

United States District Court
Northern District of California

(9th Cir. 2020) *and* 595 U.S. 178 (2022); *cf. Dun & Bradstreet Software Services, Inc. v. Grace Consulting, Inc.*, 307 F.3d 197, 208 (3d Cir. 2002) (copying of 27 lines out of 525,000 lines of computer code was not de minimis where copied material was so essential that software program could not work without it).

Even if the Court were to find, as Simpson urges, that the API as a whole is entitled to protection and that MiTek copied most of Simpson's API from each catalog, the Court reaches the same conclusion—namely, MiTek's copying of most of a two-page index of part names from a catalog that exceeds 300 pages is so insubstantial in each instance that the accused work is not substantially similar to the asserted work.

The Court concludes that Simpson has not met its burden to show that MiTek's copying is sufficient in terms of quantity or quality to render the accused works substantially similar to the asserted works; instead, the Court finds that the copying is de minimis.

### 3. Fair use

MiTek argues that its use of Simpson part names in its reference number indices constitutes fair use. *See* Dkt. No. 171 ¶¶ 124-137. "Fair use" is an equitable defense to copyright infringement. *Tresóna Multimedia, LLC v. Burbank High School Vocal Music Ass'n*, 953 F.3d 638, 647 (9th Cir. 2020). The doctrine has been codified at 17 U.S.C. § 107. *Id.* That statute requires the Court to consider the following non-exhaustive list of factors: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. 17 U.S.C. § 107. Because fair use is an affirmative defense, MiTek bears the burden of proof. *Dr. Seuss Enterprises, L.P. v. ComicMix LLC*, 983 F.3d 443, 459 (9th Cir. 2020).

Here, MiTek concedes that its use of part names from Simpson's API is commercial, as the use is intended to facilitate the sale of MiTek connector products further described in MiTek's catalogs and elsewhere. *See* Dkt. No. 171 ¶ 137. This first factor, while not dispositive, does not

United States District Court
Northern District of California

1   support application of the fair use doctrine.[7]  However, it is equally undisputed that the

2   copyrighted works—Simpson's catalogs—are also commercial works that serve both functional

3   and promotional purposes.  The catalogs are not highly creative works.  This second factor

4   suggests that the scope of fair use here is broader than for other, highly creative and/or

5   noncommercial works and favors application of the fair use doctrine.  *See Dr. Seuss Enterprises,*

6   *L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1402 (9th Cir. 1997) ("[C]reative works are

7   'closer to the core of intended copyright protection' than informational and functional works,

8   'with the consequence that fair use is more difficult to establish when the former works are

9   copied.'") (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 586 (1994)).

10   　　As explained above, MiTek has not copied Simpson's catalogs in their entirety.  Rather,

11   MiTek has copied portions of Simpson's two-page API in each catalog.  The Court's findings

12   regarding the nature and extent of the copying are described above in section III.D.2 of this order.

13   The amount of copying is de minimis, and the significance of the material copied is qualitatively

14   insubstantial.  This third factor supports application of the fair use doctrine here.  Finally, MiTek's

15   copying has no effect on the actual or potential market value of the copyrighted works or their

16   derivatives, as there is no such market for Simpson's catalogs, but only for the connectors the

17   catalogs describe.  This fourth factor strongly favors application of the fair use doctrine.

18   　　Considering all of the relevant factors, the Court concludes that MiTek's copying, even if

19   it were actionable, constitutes fair use.

20   　　　　　　　　**4.**　　　**Copyright misuse**

21   　　MiTek argues that Simpson has engaged in copyright misuse by improperly extending the

22   scope of its copyright protection to include product names.  *See* Dkt. No. 171 ¶¶ 155-160.

23   "Copyright misuse" is also an affirmative defense.  *Practice Management Information Corp. v.*

24   *American Medical Ass'n*, 121 F.3d 516, 520 (9th Cir. 1997), *amended*, 133 F.3d 1140 (9th Cir.

25   1998).  It applies when a copyright owner extends its monopoly beyond the scope of the copyright

26   grant.  *Id.*

27   

28   [7] MiTek does not contend that its use is "transformative."  *See, e.g.*, *Google LLC v. Oracle America, Inc.*, 141 S. Ct. 1183, 1202-04 (2021).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Because the Court has already concluded that at least some, if not all, of Simpson's

2    product names and their corresponding part names have the requisite minimal creativity, MiTek

3    cannot establish copyright misuse on the theory that Simpson is attempting to extend its copyright

4    protection to product names and part names that are *per se* unprotectable.

5    **E.    Statute of Limitations**

6    MiTek contends that claims 1-4 are barred by the applicable three- or four-year statute of

7    limitations.  *See* Dkt. No. 171 ¶¶ 114-116.  Simpson responds that because MiTek's conduct—the

8    alleged false advertising, passing off, and unfair competition—is continuing, these claims are not

9    barred by the statute of limitations.  The Court agrees.  Here, the challenged conduct includes

10   conduct within the limitations period and Simpson seeks only prospective injunctive relief.  *See*

11   *Jarrow Formulas, Inc. v. Nutrition Now, Inc.,* 304 F.3d 829, 837 (9th Cir. 2002) (observing that

12   where the alleged misconduct continues, the statute of limitations does not bar a Lanham Act

13   claim, except as to damages beyond the statutory period).

14   The Court concludes that MiTek has not established this defense.

15   **F.    Laches**

16   MiTek contends that claims 1-4 are barred by the doctrine of laches.  Dkt. No. 171 ¶¶ 82-

17   109.  "Laches is an equitable time limitation on a party's right to bring suit, resting on the maxim

18   that one who seeks the help of a court of equity must not sleep on his rights."  *Jarrow*, 304 F.3d at

19   835 (citation omitted).  Laches is an affirmative defense, as to which MiTek bears the burden of

20   proof.  *See Kanne v. Connecticut General Life Ins. Co.*, 867 F.2d 489, 492 n.4 (9th Cir. 1988).  To

21   establish laches, a defendant must prove (1) that the plaintiff unreasonably delayed in filing the

22   suit and (2) the defendant suffered prejudice as a result.  *Saul Zaentz Co. v. Wozniak Travel, Inc.*,

23   627 F. Supp. 2d 1096, 1108-09 (N.D. Cal. 2008).

24   Typically, laches does not bar prospective injunctive relief.  *Pinkette Clothing, Inc. v.*

25   *Cosmetic Warriors, Ltd.*, 894 F.3d 1015, 1027 (9th Cir. 2018); *Jarrow*, 304 F.3d at 840 ("Often

26   the defendant will not be prejudiced by a bar on future conduct.") (citations omitted); *Danjaq LLC*

27   *v. Sony Corp.*, 263 F.3d 942, 959-60 (9th Cir. 2001) (same); *see also Lyons P'ship, L.P. v. Morris*

28   *Costumes, Inc.*, 243 F.3d 789, 799 (4th Cir. 2001) ("A prospective injunction is entered only on

the basis of current, ongoing conduct that threatens future harm.  Inherently, such conduct cannot be so remote in time as to justify the application of the doctrine of laches.").  However, laches may apply where a party can show evidentiary prejudice, *see, e.g.*, *Danjaq*, 263 F.3d at 955, or expectations-based prejudice, *see, e.g.*, *RSI Corp. v. Int'l Bus. Machs. Corp.*, No. 5:08-CV-3414 RMW, 2012 WL 3277136, at *15-16 (N.D. Cal. Aug. 9, 2012).  "Evidentiary prejudice includes such things as lost, stale, or degraded evidence, or witnesses whose memories have faded, or who have died."  *Danjaq*, 263 F.3d at 955.  Expectations-based prejudice occurs when a defendant "took actions or suffered consequences that it would not have, had the plaintiff brought suit promptly."  *Id.*; *see also Miller v. Glen Miller Prods.*, 318 F. Supp. 2d 923, 944 (C.D. Cal. 2004), *aff'd*, 454 F.3d 975 (9th Cir. 2006).  "[I]n each case, the district court must weigh the plaintiff's delay and the resulting prejudice to the defendant to determine whether and to what extent laches bars the requested relief, including a request for an injunction."  *Pinkette Clothing*, 894 F.3d at 1027.

### 1.    Simpson's delay

Simpson has known of MiTek's use of Simpson part names as reference numbers, without attribution, on MiTek's website, in a reference chart and elsewhere in the MiTek connectors catalog, in a separate reference conversion chart, and on point-of-sale materials in retail stores since at least 2013.  Simpson has known of similar uses of Simpson part names by other competitors, including MiTek's predecessor companies, since at least 1988.

As of at least 2015, Simpson knew that MiTek had no plans to change its use of Simpson part names as refence numbers.  Although Simpson repeatedly threatened enforcement action, it elected not to sue MiTek or its predecessors before October 6, 2020 (i.e. the date it filed this action) because it chose to invest in activities to benefit its business rather than devoting resources to litigation.

Simpson's delay in asserting claims 1-4 was unreasonable.  *See Jarrow*, 304 F.3d at 838-39 (seven-year delay was unreasonable and not excused by plaintiff's desire to obtain laboratory analysis to support litigation).  However, as Simpson seeks only prospective injunctive relief, the Court must consider whether MiTek suffered evidentiary or expectations-based prejudice as a

1   result of Simpson's delay.

2   **2.   Evidentiary prejudice**

3   MiTek contends that it has suffered evidentiary prejudice due to Simpson's delay in

4   asserting claims 1-4 because relevant documents and witnesses with information regarding early

5   uses of product names and part names by companies other Simpson were no longer available by

6   the time Simpson filed this action.  Tr. 1485:11-1487:22; Dkt. No. 171 ¶¶ 93-98.  Similarly,

7   MiTek argues that it would have been able to produce more evidence of a longstanding industry

8   practice of using reference numbers to cross-reference a competitor's products if Simpson had

9   filed this action earlier.  Tr. 1487:23-1488:15; Dkt. No. 171 ¶ 95.

10   While the fact (if MiTek could establish it as a fact) that a particular product name or part

11   name originated with another company before Simpson's use of that same product name or part

12   name might have some rhetorical appeal, that evidence would not have been relevant to claims 1-

13   4, all of which rely to some extent on the premise that a particular part name referred to a *Simpson*

14   product.  There is no dispute that all of the reference numbers in MiTek's reference number

15   indices and in its conversion guide are the part names Simpson uses for its connector products.

16   Whether MiTek engaged in false or misleading advertising in referencing those Simpson part

17   names has nothing to do with whether Simpson was or was not the first to use a particular part

18   name.[8]  Likewise, whether MiTek engaged in passing off its products as Simpson's does not

19   depend on whether Simpson was or was not the first to use a particular part name.  Nor does the

20   question of whether Simpson's part names serve a source-identifying function *now* depend on

21   another company's use of the same part name at some point in the past.[9]

22   With respect to evidence of industry practice concerning the use of a competitor's part

23   names as reference numbers, MiTek made a persuasive showing on this point.  As detailed above,

24   there is evidence of a longstanding industry practice of using a competitor's part names as

25   reference numbers, with and without attribution to the competitor.  This evidence could bear on

26   the question of how the relevant audience understands MiTek's use of reference numbers for

27

28   [8] *See* discussion of claims 1 and 2, *supra*, section III.A.
    [9] *See* discussion of claims 3 and 4, *supra*, sections III.B and C.

United States District Court
Northern District of California

purposes of claims 1 and 2.  However, MiTek has not shown that it would have been able to present better or different evidence on this point had Simpson asserted claims 1 and 2 earlier.

The Court concludes that MiTek has not shown evidentiary prejudice as a result of Simpson's delay.

### 3.    Expectations-based prejudice

MiTek contends that it suffered expectations-based prejudice due to Simpson's delay in asserting claims 1-4, principally because Simpson's demand for injunctive relief, if successful, would require MiTek to alter its point-of-sale merchandising material at 2500 retail locations at a projected cost of $1.25 million.  Tr. 1488:16-25; Dkt. No. 171 ¶¶ 99-103.  However, MiTek presented no evidence that it would have altered its point-of-sale materials to exclude reference numbers in the first instance, thereby avoiding this $1.25 million expense, had Simpson filed this action at some earlier time.  Similarly, MiTek presented no evidence that it would have altered its dual specification strategy or investments in other marketing materials in any way had Simpson filed an action challenging MiTek's use of reference numbers at some earlier time.  In sum, none of MiTek's witnesses testified about *anything* that MiTek would have done differently had Simpson asserted any of claims 1-4 prior to 2020.

The Court concludes that MiTek has not shown expectations-based prejudice as a result of Simpson's delay.

Because MiTek has not demonstrated either evidentiary prejudice or expectations-based prejudice, laches does not bar Simpson's claims 1-4.

### G.    Estoppel, Waiver, or Acquiescence

MiTek argues that all of Simpson's claims are barred by the equitable doctrines of estoppel, waiver, or acquiescence.  Dkt. No. 171 ¶¶ 117-123.  These are affirmative defenses for which MiTek bears the burden of proof.

"Equitable estoppel" requires a defendant to show that "(1) the party to be estopped knows the facts; (2) the party intends that his or her conduct will be acted on; (3) the claimant must be ignorant of the true facts; (4) and the claimant must detrimentally rely on the other party's conduct."  *Salgado-Diaz v. Gonzales*, 395 F.3d 1158, 1166 (9th Cir. 2005), *amended*, 2005 WL

United States District Court
Northern District of California

1   553046.  Here, MiTek has shown that Simpson failed to act on its many prior threats to initiate

2   legal action against MiTek and its predecessors, but MiTek has not shown that Simpson intended

3   MiTek to rely on the absence of enforcement action or that MiTek detrimentally relied on the

4   absence of such enforcement.  *See* discussion, *supra*, section III.F.3.

5          "Waiver" refers to the intentional relinquishment of a known right.  *United States v. King*

6   *Features Ent., Inc*., 843 F.2d 394, 399 (9th Cir. 1988).  MiTek has not shown that Simpson

7   intended to waive any of its rights under the Lanham Act, California Business & Professions Code

8   §§ 17200 and 17500, or the Copyright Act by delaying enforcement of those rights.

9          "Acquiescence" is very similar to the equitable defense of laches.  *Seller Agency Council,*

10  *Inc. v. Kennedy Ctr. for Real Est. Educ., Inc*., 621 F.3d 981, 988 (9th Cir. 2010).  However, unlike

11  laches, acquiescence requires an "*affirmative* act . . . by the party that conveys implied consent to

12  another."  *Id.* (emphasis in original).  As discussed above, MiTek has not established the requisite

13  elements for a laches defense, and so cannot prevail on its defense of acquiescence.  *See*

14  discussion, *supra*, section III.F.2, F.3.  Moreover, MiTek has not shown the necessary affirmative

15  act by Simpson that distinguishes acquiescence from laches.  *See Seller Agency Council*, 621 F.3d

16  at 989-990 (with respect to trademark infringement, acquiescence requires finding that senior user

17  "actively represented" it would not assert a claim).

18         The Court concludes that MiTek has not established the affirmative defenses of estoppel,

19  waiver, or acquiescence.

20  **IV.    CONCLUSION**

21         Based on the foregoing findings of fact and conclusions of law, the Court concludes that

22  Simpson did not prove that MiTek is liable for false advertising under the Lanham Act, 15 U.S.C.

23  § 1125(a)(1)(B) and California Business & Professions Code § 17500 (claims 1 and 2); passing off

24  under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) (claim 3); unfair competition under California

25  Business & Professions Code § 17200 (claim 4); and copyright infringement under 17 U.S.C.

26  § 106 (claim 5).

27         Judgment shall be entered according to these findings of fact and conclusions of law in

28  favor of defendant MiTek.

**IT IS SO ORDERED.**

Dated: December 15, 2023

VIRGINIA K. DEMARCHI
United States Magistrate Judge